SECOND DIVISION
MARCH 30, 2010

1-08-0235

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 15514 |
| | ) | |
| SHELDON BAINES, | ) | Honorable |
| | ) | Jorge Luis Alonso, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE CUNNINGHAM delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Sheldon Baines, was convicted of attempted first degree murder and armed robbery, receiving consecutive prison terms of 25 years and 10 years for those respective offenses. On appeal, the defendant seeks reversal of his convictions and remand for a new trial on two grounds: first, he claims that he was denied the effective assistance of counsel at trial, and, second, he asserts that the trial court erroneously allowed improper hearsay testimony identifying the defendant as a guilty party. However, the defendant also seeks an outright reversal on the basis of insufficiency of the evidence. For the following reasons, we reverse the defendant's convictions and remand the case for a new trial.

## BACKGROUND

At trial, the victim, Anthony Deveaux (Deveaux), gave the following testimony. On December 30, 2004, at about 9 p.m., a man whom he knew by the name of Michael Wilson (Wilson) repeatedly attempted to telephone him. At the time of these calls, Deveaux only knew Wilson as "Little Mike." Deveaux had recently offered Wilson a job. When Deveaux finally answered the telephone call, Wilson asked him to come to Wilson's apartment so he could show Deveaux some

tools he planned to use in his work for Deveaux. Wilson also told Deveaux that he wanted him to meet his family.

Deveaux and his girlfriend, Chenita Lawson (Chenita), drove to Wilson's apartment building on South Langley Avenue in Chicago, where they saw Wilson in front of the building. Leaving Chenita in the car, Deveaux joined Wilson and they went to the second floor of the apartment building. Wilson told Deveaux to wait in the hallway, outside apartment 107, saying he wanted to make sure his mother was properly dressed. As Deveaux waited, the building janitor, Derek McGee, approached him and asked what he was doing there. Deveaux told McGee that he was waiting for someone to come out of apartment 107. McGee then walked away. Minutes later, Wilson stuck his head out of the doorway of apartment 107 and told Deveaux to come in. When Deveaux did so, Wilson closed the door behind him.

Deveaux saw that the apartment was vacant, with no furniture. Suddenly, a man whom Deveaux identified in court as the defendant came out of a closet, holding a revolver. In identifying the defendant in court, Deveaux said, "This gentleman right here. I mean it's no mistaking this guy. I mean there's no mistaking him." Another man (the third man), also armed with a revolver, came out of a bedroom. Wilson was standing behind Deveaux as the two men with guns, the defendant and the third man, approached. The defendant told Deveaux not to move or call for help. Wilson took Deveaux's bracelet and money and one of the men took his cell phone. The third man kept his gun pointed at Deveaux. During the attack, Wilson grabbed Deveaux by the neck from behind, and the defendant and the third man, both still armed, also grabbed Deveaux. The defendant and Wilson repeatedly told the third man to shoot Deveaux. Wilson also produced a revolver and pointed it at

2

Deveaux's head. The defendant then told Wilson to shoot Deveaux. Deveaux managed to twist Wilson's arm, but Wilson's gun went off, striking the back of Deveaux's neck and causing what was described as a through-and-through wound.

Deveaux testified that during this struggle, which lasted two or three minutes, someone knocked on the door of apartment 107. Wilson went to the door, but returned without having let anyone in. When Wilson and the defendant began hitting Deveaux on the head with their gun handles, Deveaux broke free and tried to escape through a window. The defendant then fired three shots at Deveaux, striking his arm, thigh, and buttock. Deveaux escaped onto the roof of an adjoining building, which was the same height as the apartment from which he had fled. He testified that after lying there a short while, he saw that his attackers had fled. Deveaux managed to walk to the edge of the roof, from which he could see his car with Chenita inside. He began shouting that he had been robbed. When he saw that the janitor, McGee, had entered the apartment from which he had just escaped, Deveaux reentered the apartment by the same window through which he had fled. Police officers and firemen were called to the apartment, and Deveaux was taken to the hospital by paramedics.

At trial, Deveaux showed the jury the gunshot wounds he had received when he was attacked. One bullet had gone through his neck and a second bullet passed through his arm. Two other bullets entered his right thigh and his right buttock and remained in his body at the time of trial. Deveaux testified that on January 6, 2005, seven days after the attack, he called Chicago police detective James Scannell and gave him the number of the telephone from which Wilson had repeatedly called him on the day of the attack. Deveaux testified that Wilson had called so many times that Deveaux

memorized the telephone number from which Wilson placed the calls. On January 30, 2005, Deveaux was shown a group of photographs. He identified a photograph of Wilson as one of his attackers. He again identified Wilson in a lineup on May 2, 2005. On May 26, 2005, he was shown additional photographs, including one of the defendant, but was unable to identify anyone. On June 15, 2005, after viewing a lineup for about five minutes, Deveaux identified the defendant as one of his attackers.

Deveaux testified during the trial that he had prior convictions for burglary in 1998 and robbery in 1994. He admitted that sometime after he identified Wilson on January 30, 2005, he reported to the police that he had seen one of his attackers in a Home Depot store. This information was elicited by defense counsel in an indirect manner after he had asked Deveaux a series of questions which the trial court said were confusing. It had been established by the police prior to trial that a man named Hedley, whom Deveaux saw at a Home Depot store and reported to the police as one of his attackers, had a firm alibi because a videotape established that he was working at the Home Depot store at the time of the attack. Nonetheless, at trial Deveaux testified that he still believed that Hedley was "possibly" involved in the attack. Deveaux testified that he thought it was Hedley who was the third man who had come out of the bedroom. Deveaux also testified that he was 5 feet 9 inches tall, and he believed that the defendant was 6 feet 1 inch, or 6 feet 2 inches tall. The record establishes that the defendant was 6 feet 6 inches tall. Deveaux testified that he was able to quickly identify the defendant because, "When you're wrestling with somebody for a couple of minutes and they're trying to shoot you, you have a hard time forgetting their face." However, Deveaux had previously identified Hedley as the man who had shot him as they wrestled. He had

4

also testified that it was Wilson who first shot him during this struggle. At trial, it was defense counsel who elicited from Deveaux that he had told the police that two of the attackers had something wrong with their teeth. Deveaux stated that the defendant had "teeth that weren't looking right inside of his mouth." However, at the time of trial, Deveaux could not recall whether there was anything wrong with the teeth of Hedley, the person he saw at the Home Depot store and believed to be one of his attackers.

Derek McGee, the building janitor, testified at trial and corroborated Deveaux's testimony about encountering him in the hallway outside of apartment 107 prior to the attack. McGee testified that he was suspicious when Deveaux told him he was waiting for someone in apartment 107 because McGee knew that the apartment was vacant. McGee later returned and knocked on the door of apartment 107. He testified that he heard someone say "[Y]'all and [*sic*] ain't got to do this. Don't do this. Please. Please." A person whom McGee identified at trial as Wilson then opened the door. McGee went to another floor to consult with a fellow janitor, and then telephoned the police. When McGee returned to his apartment, he heard four to six gunshots coming from the vicinity of apartment 107. McGee's wife looked through the peephole in their front door and saw two men fleeing the building. McGee then entered apartment 107, where he saw Deveaux on an adjoining roof, "hollering." McGee helped Deveaux, who was covered in blood, reenter the apartment. Shortly thereafter the police and paramedics arrived.

Chenita testified that she drove Deveaux to the South Langley address. Deveaux left her in the car, met a man at the apartment building entrance, and entered the building with that man. A few minutes later, Chenita heard gunshots and then heard Deveaux screaming her name. She saw him

5

leaning over the roof of an adjoining building. Deveaux told her he had been shot. The police quickly arrived and Chenita entered the apartment with them. Deveaux was sitting on the floor, bleeding from a number of wounds.

Chicago police officer David Holliday testified for the State that on the date in question he was on patrol with his partner in a marked vehicle, in the vicinity of the crime. Officer Holliday heard someone calling "police, police." He saw Deveaux on the roof of a building. Deveaux called out that he had been shot. Because Deveaux was covered in blood, Officer Holliday called for medical services. He and his partner went up to apartment 107, where Deveaux was now inside on the floor. Deveaux told the police officers that three people had robbed and shot him. He had sustained several gunshot wounds. According to Officer Holliday, it was difficult to get information from Deveaux because of his wounds, one of which was to his throat. Deveaux did describe one of his attackers as a black male, age 20 to 24, about 5 feet 11 inches. He described the other two offenders' heights as 5 feet 7 inches, and 5 feet 11 inches. Deveaux was then transported to the hospital.

Chicago police detective James Scannell testified that he was assigned to investigate the crime. In early January, 2005, Deveaux called and gave him the telephone number of one of the three attackers. Deveaux said he had memorized the number because this person had called him many times before the crime. Detective Scannell's investigation established that the telephone number belonged to Wilson. Deveaux subsequently viewed a photographic array and identified Wilson as one of his attackers. Wilson was arrested on May 1, 2005, and the next day Deveaux identified him in a lineup as one of the men who had attacked him. Without objection from defense

counsel, Detective Scannell testified that he spoke to Wilson and then began searching for the defendant. On May 5, 2005, Deveaux was shown a photographic array which included the defendant's photograph. Deveaux could not make an identification from the photographic array. However, the defendant was arrested on June 14, 2005. On June 15, 2005, Deveaux viewed a lineup and identified the defendant as one of his attackers.

On cross-examination by defense counsel, Detective Scannell testified that on the day of the attack he interviewed Deveaux at the hospital. Deveaux told him that a man named "Little Mike" and two other men had attacked him. Deveaux said the two other attackers were each 5 feet 11 inches tall. Detective Scannell acknowledged that the defendant was in fact 6 feet 6 inches tall. Defense counsel also introduced into evidence a photograph of the lineup of June 15, 2005, in which Deveaux had identified the defendant as one of his attackers. Height markers in the photograph show that the defendant was the tallest man in the lineup, at 6 feet 6 inches, with the next two tallest men each being approximately 5 feet 11 inches tall.

Defense counsel presented the testimony of Chicago police detective Richard Kelly, who was one of the police officers who investigated the crime. Detective Kelly testified that sometime in February, 2005, Deveaux alerted him that he had seen one of his attackers working at a Home Depot store. Deveaux told Detective Kelly that he was "100 per cent" certain of his identification of that man. Detective Kelly later learned that the man's name was Hedley. Deveaux also told Detective Kelly that he would never forget Hedley's face, as he believed that Hedley shot him as they were face to face during the struggle. However, at trial Deveaux testified that it was Wilson who shot him during the face-to-face struggle. Detective Kelly testified that, upon investigation, the police

determined that Hedley could not have been one of Deveaux's attackers, because they had videotape evidence which conclusively established that Hedley had been at work at the Home Depot store at the time of the attack. Nonetheless, according to Detective Kelly's testimony, Deveaux continued to insist that he was "standing by" his identification of Hedley as the third man who attacked him.

Testifying on his own behalf, the defendant admitted that he had been convicted of two prior felonies: possession of a stolen motor vehicle in 1994, and unlawful use of a weapon in 1995. He testified that he had not heard of the attack on Deveaux until he was arrested on June 15, 2005. He could not recall where he was on the day of the crime. He also admitted that he had given the police a number of different alibis. He had told the police that he had been at a family gathering; with his girlfriend; at his mother's house; and at a birthday party. The defendant admitted, under questioning by his own defense counsel, that although he had previously told the police that he did not know who Wilson was, in fact he knew Wilson "very well." During questioning by his defense counsel the defendant acknowledged having damaged teeth, thereby seeming to support the testimony of Deveaux that one of his attackers had damaged teeth.

At the conclusion of trial, the defendant was convicted of attempted first degree murder and armed robbery, receiving consecutive prison terms for those respective offenses of 25 years and 10 years. The defendant then filed this appeal from those convictions.

ANALYSIS

The defendant contends that his defense counsel at trial conducted his defense in such a manner as to deny him his constitutional right to the effective assistance of counsel. The standard which a defendant must meet in establishing such ineffective assistance of counsel as to require

reversal of a criminal conviction is a high one. A two-pronged test is applied. First, the defendant must demonstrate that his trial counsel's representation was so unprofessional that it fell below an objective standard of reasonableness; then, the defendant must establish that he was prejudiced by this ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Hamilton, 361 Ill. App. 3d 836, 847, 838 N.E.2d 160, 170 (2005).

Ineffective assistance of counsel is a contention that is often raised by defendants on appeal from a criminal conviction. The cases in which Illinois courts of review have found counsel to be ineffective, requiring reversal of a criminal conviction and remand for a new trial or a new evidentiary hearing on a postconviction petition, involve many different acts or omissions by trial counsel. As we have noted, this is a high standard and the facts of each case are different. Therefore, it has been useful to review all cases, decided in Illinois in the past two decades, in which the appellate court reversed criminal convictions and remanded the case for a new trial or remanded for a new evidentiary hearing on a postconviction petition, based on ineffective assistance of counsel.

In the case before us, it is evident from the record that there is merit to the defendant's contention that his representation fell below an acceptable standard. Turning immediately to the defendant's assertion on appeal regarding the many instances of his trial counsel's ineffectiveness, we note that when defense counsel had completed his direct examination of the defendant, the following exchange occurred between defense counsel and the defendant:

> "Q. Mr. Baines [the defendant], is there anything else you'd
>
> like to add?

A.  It's a bunch of things I would like to add.

Q.  Okay.  Well, start with one and then we'll go into that area.

MS. GUDINO [assistant State's Attorney]: Objection

THE COURT: Overruled.

THE WITNESS: If you look on my sheet, my arrest report sheet where I made statements, I would like you to ask me questions off of there.

THE COURT: Go ahead.

MR. KAMIN: Thanks.  All right."

From this exchange it is clear that the defendant is guiding his defense counsel in how to conduct the direct examination in order to elicit relevant information.  This is most unusual, as one would expect the lawyer to develop the strategy that guides the questions.  However, the record in this case is replete with examples of unusual behavior by defense counsel.  It was at this juncture that defense counsel elicited from the defendant a damning admission.  Under questioning by defense counsel, the defendant admitted that although he had earlier told the police that he did not know Wilson, his alleged accomplice in the crime, in fact he knew Wilson "quite well."  This evidence is clearly harmful to the defendant.  And, a review of the record reveals that the gravity of the harm caused by this evidence was lost on defense counsel, as he continued to question his own client in a manner which bolstered the State's case.

The defendant asserts, and argued strenuously during oral argument on appeal before this

court, that defense counsel was "clumsy" in eliciting an admission from Deveaux that he (Deveaux) had misidentified an innocent man, Hedley, as the third man who attacked him. As the defendant points out on appeal, this was clearly an extremely important fact in attacking the strength of Deveaux's identification testimony. A review of the transcript confirms the defendant's assertion of an extremely clumsy cross-examination by defense counsel in which counsel clearly did not know the facts surrounding Deveaux's misidentification of Hedley as the third man who participated in the attack. Defense counsel asked many questions during this part of the trial but never clearly or unequivocally established the crucial point, which is the weakness of Deveaux's identification of the defendant. Although lengthy, it is useful to reproduce an excerpt of defense counsel's cross-examination of Deveaux in order to illustrate how it was conducted and the harm it caused the defendant. The following excerpt speaks for itself:

"MR. KAMIN [defense counsel]: Mr. Deveaux, let's start with identifications. Now, let's see. You were shown photographs on January 30, 2005, right?

A. I believe so.

Q. And that was [Wilson], you identified [Wilson]?

A. On this photograph, correct.

Q. And you were shown about six photographs?

A. I believe so.

Q. And you were shown them one at a time?

A. I don't recall. I don't think it was one at a time. I thought

11

they were all on the same sheet.

Q. But did you look at each one carefully?

A. Yes.

Q. Now, after you viewed a lineup with [Wilson] in it, you viewed another lineup, a physical lineup, correct?

A. That's correct.

Q. That was about in March[1] of 2005?

A. I believe so.

Q. And you said that person, that you were 100 percent sure that person had been involved in the robbery?

A. I believe so.

Q. Based on your identification the police did an investigation of that person?

MS. DAWKINS [assistant State's Attorney]: Objection

THE COURT: Sustained.

A. I don't know anything about that part.

THE COURT: Wait for the next question.

MR. KAMIN:

---

[1]Defense counsel was apparently attempting to elicit testimony about when Deveaux saw a person named Hedley at a Home Depot store whom he believed to be one of his attackers. This actually occurred in February of 2005. Deveaux was never asked to identify Hedley in a lineup.

Q. You never learned of what the police had done after that?

A. Not to my recollection, no.

Q. Your identification, did you ever talk to them about that identification?

MS. DAWKINS: Objection.

THE COURT: Overruled.

A. Did I ever talk to them about –

Q. I'm talking about a fellow employee of yours – excuse me.

A fellow coworker of yours."

Although there was never any evidence or testimony about a coworker of Deveaux being involved in the attack, defense counsel clearly thought that Deveaux once worked at the Home Depot store with Hedley. There was nothing in the record to hint at how defense counsel reached such a conclusion. However, it shows a shocking lack of familiarity with the basic facts of the case. Defense counsel continued on this erroneous and confusing path:

"A. [Deveaux] A coworker of mine?

Q. [Defense counsel] Yes.

A. They.

THE COURT: Ask a question, please.

Q. Well, let me start from the beginning to make this clear?

A. Okay.

Q. Did you ever view a lineup with a coworker on that date?

A.  I've been retired for like six years.  I don't have any coworkers.

Q.  Back then were you retired?

A.  Yes.  I don't have any coworkers though.

Q.  You didn't have any coworkers at that time.  You were retired?

A.  No.

Q.  What was your last job?

MS. DAWKINS: Objection.

THE COURT: Overruled.

A.  I worked for the Federal Government as a programming specialist.

Q.  That was your last job.

A.  That was my last job, correct.

Q.   At that time about March [*sic*] of 2005, you were unemployed?

A.  I've been self-employed for five years.  I wasn't working for anybody else at that time.  I don't have any coworkers at all.

Q.  Let's see.  Again, we're talking about the physical lineup that you viewed in the spring of 2005 at approximately in March [*sic]*?"

14

Defense counsel clearly did not know the facts which underpinned his questions. His questioning suggests that he believed that Deveaux had at some point identified Hedley in a lineup or a photo array as the third man who attacked him. That had never occurred as Hedley was exonerated by the police investigation shortly after Deveaux claimed that Hedley was the third assailant. Much confusion ensues as defense counsel forges ahead, seemingly oblivious to the facts of the case:

"MS. DAWKINS [assistant State's Attorney]: Objection.

THE COURT: Basis.

MS. DAWKINS: There was a lineup on May 2nd, and one on May 20 – May 2nd is the correct date.

THE COURT: Objection is overruled. Do you want to change the question, or do you want to ask him, if there was a lineup in March?

Q. Okay. Let's see. On May 26th you viewed a photo array, correct?

A. I don't recall. If you have one of those sheets I could see. I would know whether I did or not.

Q. May I approach.

THE COURT: Yes, sir. This the [*sic]* People's No. 20.

MR. KAMIN: Yes, this is People's No. 20.

Q. This is the People's No. 20. You identified this before. The date. What date is that?

A.  Okay, May 26th.

Q.  May 26th, okay.  Do you recall viewing - -

A.  Yes.

Q.  – a photo array on that day, yet you recall not making an identification on that day?

A.  I believe so.

Q.  Now, a few months earlier you viewed a photo array and you did make an identification, correct?

A.  Correct.

Q.  And that was an identification of [Wilson], correct?

A.  Correct.  [Wilson]'s ID was prior to that second array.

Q.  I'm going backwards, okay.  It's a little bit difficult.

A.  Okay.

Q.  Okay.  Between May 26th and January 30th, the first array is January 30th, between [Wilson] and this photo array when you did make an identification, did you view any physical lineups?

A.  I don't recall.  I don't believe so.

Q.  You didn't recall.  You didn't recall viewing a lineup where you were 100 percent certain the person was involved in the robbery, shooting?

A.  Do you have a specific date?

Q. The specific date is May 2nd.

A. Unless I signed something I don't remember. It's a lot of

different dates you've got going on. I'm just being honest."

This series of confusing and confused questions continues in the transcript for nine additional pages,

during which the trial court was forced to interrupt in order to ascertain what testimony defense

counsel was attempting to elicit from the witness. The following exchange took place:

"THE COURT: Mr. Kamin, can you tell me what you're

asking one more time? What is your question?

MR KAMIN: The question is, did he view a physical lineup

before he viewed the photo array that I just showed him.

THE COURT: Are you asking about the lineup that he's

already testified that he saw and he identified [Wilson] in on May 2,

2005, or are you saying besides that lineup.

MR. KAMIN: We, that was a photo array I'm asking about a

physical lineup.

A. No.

THE COURT: He's already told us that there was a physical

lineup where he identified [Wilson]. He saw the photographs in court

and he marked them in court.

You've got a photo lineup in January where [Wilson] is

identified. We then have a physical lineup on May 2nd where

[Wilson], the person of [Wilson] is identified. And then three weeks later, May 26th, we have a photo lineup which he identified your exhibit as representing and no one was identified in that photo lineup.

THE WITNESS: Correct.

MR. KAMIN: So what you're saying is that you can't recall whether you viewed a photo – excuse me. A physical lineup before the physical lineup in which the defendant was present?

MS. GUDINO [another prosecutor]: Objection.

THE COURT: Overruled. Are you saying from May 2nd where [Wilson] was identified? Are you asking him aside from that lineup?

MR. KAMIN: I'm asking – right. Aside – basically I'm trying to find out if there was another physical lineup in addition to this one that he testified to.

THE COURT: Do you understand, sir?

A. Not really, sir. I simply don't recall, because what you're saying I don't recall."

It is unclear, from defense counsel's questions, to whom he is referring in relation to the lineup. The witness at one point seems to think counsel is asking about Wilson. In fact this series of questions sought information about the erroneous identification of Hedley in a lineup. However, no such lineup ever occurred and defense counsel clearly did not know that important fact. As the confusion

18

continues, even the witness seems to recognize that defense counsel needs to establish a foundation for his questions by refreshing the witness's recollection, as evidenced by the following exchange:

"MR KAMIN: You never recall viewing a physical lineup that didn't include my client?

A. I do not recall. If you have a document or something, maybe that will refresh my memory, or something, but I don't recall.

MR KAMIN: Excuse me, your Honor.

THE COURT: Take your time.

MR KAMIN: You don't recall saying that you were 100 percent positive that one of the participants in that lineup was involved in the robbery?

A. The reason I'm having a hard time answering you, is because I don't even remember or recall what time it is that you're talking about. Now, if you have a document or something, that will help me out, but you keep saying, do I recall.

THE COURT: He doesn't understand the question.

THE WITNESS: I really don't understand that you're asking me. You asked me did I see a picture of [Wilson], I said yes.

THE COURT: Mr. Deveaux if you don't understand the question, just say so.

A. Yes, sir.

19

MR. KAMIN: Your Honor, may I have a moment.

THE COURT: Take your time.

MR. KAMIN: Well, let's see.  You said that to remember this photo array you need, what, a document?  You want documentary evidence to see if this alleged physical lineup exist [*sic*]?

A.  Sure. If that would help me to recall.

Q.  Well, sure.  Is that what you said?

A.  Correct."

The record reveals that defense counsel next attempted to approach the witness with a document, but the prosecutor objected and requested a sidebar.  The trial court granted another of the many sidebars held during this trial.  The prosecutor told the court that defense counsel was approaching the witness with a police report, which the prosecutor believed was an improper document with which to refresh the witness's recollection.  Upon further colloquy, the prosecutor explained to the trial court that what was at issue was a supplementary report documenting Deveaux's identification of a person other than the defendant as one of his attackers. The prosecutor told the trial court that no lineup or photographic array was involved in the identification of Hedley as the third man.  Deveaux had seen Hedley at a Home Depot store in February of 2005.  Deveaux then told the police that he was "100 percent positive" that Hedley was the third man who had attacked him.  Hedley was taken into custody by police the next day, but no lineup or photo array including Hedley was ever shown to Deveaux.  This was because a police investigation quickly established with certainty that Hedley was working at the Home Depot store when the attack

occurred, and therefore he could not have been one of the attackers. This explanation of the issue to the trial court by the prosecutor was straightforward and reasonably simple, and it was at the core of the theory of the defense. Defense counsel agreed with the prosecutor's rendition, telling the trial court that Deveaux's statement about being 100% positive regarding the identification of Hedley as the third man was what he was attempting to elicit from Deveaux. A review of the questions asked and answers elicited by defense counsel reveals that he never elicited that testimony from Deveaux with anything approaching clarity.

The circumstances surrounding Deveaux's misidentification of Hedley as the third man were an integral part of the factual structure of the defense contention that Deveaux was mistaken in his identification of the defendant as one of his attackers. Under the circumstances it seems basic and elemental to expect defense counsel to know the facts which supported the defense. Yet, defense counsel was clearly and wholly unaware of many basic facts. This lack of knowledge of the facts of the case contributed to and accounted for defense counsel's inability to ask clear questions, designed to get the information which the prosecutor told the judge defense counsel was trying to elicit from the witness. It is therefore clear that defense counsel's preparation for trial did not include familiarizing himself with some of the basic facts of the case which were crucial to the defense of his client.

A puzzled trial court asked defense counsel if there was some strategic reason why he did not simply ask Deveaux if it was true that in March[2] of 2005 he had identified someone at a Home Depot

---

[2]As previously noted, It was subsequently established that Deveaux saw Hedley at a Home Depot store in February, 2005.

store as being one of his attackers. The court stated: "I think the man is trying to answer your question. He is confused, and he is correct in being confused, because you are mentioning the prospect of a lineup and a photo array, neither one of those things happened ***." Defense counsel then stated that he had "assumed" this statement was made when Deveaux viewed a physical lineup. Once again, this highlighted his lack of familiarity with the facts of the case. The court told defense counsel he could ask the witness if he had made a statement to the police after he saw Hedley at the Home Depot store, but the court wanted to know how defense counsel would prove that Hedley was not one of the three attackers. Defense counsel responded that he intended to use police witnesses to bring this out. The record shows that this was also never accomplished with clarity.

When questioning resumed, defense counsel elicited from Deveaux that he could not recall whether he had said he was 100% certain about his identification of Hedley. Deveaux also could not recall whether he had earlier told the police that Hedley was the attacker who had come out of the closet in the apartment. Deveaux admitted that, other than Wilson, he had never before seen the men who had committed the attack. Deveaux also testified without challenge by defense counsel that he did not recall the police informing him that Hedley was not involved. This response would and should have provided fertile ground for follow-up questions by defense counsel regarding the certainty of Deveaux's identification testimony and the police informing him that Hedley was not involved, thus challenging his memory of the facts. Surprisingly there was also no follow-up by defense counsel when Deveaux testified that he still believed that "possibly" Hedley was one of his attackers. This was clearly a missed opportunity to establish with clarity that the police *had* determined that Hedley, who had been identified by Deveaux with *100% certainty*, was exonerated,

22

yet Deveaux continued to display uncertainty on this point. Defense counsel did not press Deveaux with obvious follow-up questions. This was an opportunity to highlight the uncertainty of Deveaux's identification testimony, including the identification of the defendant. This befuddling scenario continued without any serious challenge by defense counsel to the inability of Deveaux to accurately and consistently identify his attackers, and their respective roles, coupled with Deveaux's insistence that an innocent man was one of his attackers. All of this should and could have been made clear to the jury, but it was not.

Deveaux, by his own testimony, had only a few minutes to view the two attackers whom he did not know. He had no opportunity to identify the defendant until almost five months after the event. At that time he viewed a photographic array which included the defendant. Yet he did not identify the defendant in that photographic array. His height description of the defendant varied greatly from the defendant's true height. The defendant was quite tall, but Deveaux never told the investigating police officer this fact. However, several months after the crime, when Deveaux viewed the defendant in a lineup in which the defendant was significantly taller than the other men in the lineup, he identified the defendant. It was only upon viewing this lineup, with the significant height disparity, 5 1/2 months after the attack, that Deveaux identified the defendant.

But the evidence which was the most devastating to Deveaux's account was that even at trial he continued to maintain that Hedley was the third man, even after the police had unequivocally exonerated Hedley. Additionally, Deveaux confused the actions of the man he thought was Hedley for the actions of Wilson, whom he actually "knew well." At one time he ascribed to the third man the actions he later ascribed to Wilson. Deveaux testified that it was Wilson who first shot him in

23

the initial struggle in the apartment. At no point did defense counsel *ever* bring out these discrepancies *with clarity*, if at all. Defense counsel's inept questioning of Deveaux eroded the effect of evidence which clearly would have been helpful to his client's defense. And rather than establishing the theory of defense with clarity, defense counsel often succeeded in buttressing the State's case. He confused the judge, the prosecutors, and most likely the jury when he attempted to elicit important testimony from Deveaux. We reject the State's argument that because the evidence in question may have been brought out indirectly through the testimony of a police officer and Deveaux, there was no harm to the defense. As we have highlighted, there was never any clarity regarding the facts which underpinned the theory of defense. The manner in which defense counsel sought to establish his defense can only be described as confusing.

The State also argues that defense counsel's actions were merely trial strategy. But it defies reason to believe that defense counsel would intentionally fail to bring out the very essence of the defense theory in the clearest possible manner. Deveaux identified an innocent man as one of his attackers, asserting his "100 percent" certainty, and also mistaking this man's actions for Wilson's, whom Deveaux testified at trial was the man who first shot him in the struggle. This significant discrepancy in Deveaux's testimony was never made clear to the jury.

The record is replete with efforts by the trial court to ensure that the trial was conducted fairly. For example, when defense counsel indicated that the defense had completed its case, the trial court recognized that defense counsel still needed to introduce into evidence the fact that the defendant's photograph was in the photo array which Deveaux had viewed without identifying the defendant as one of his attackers. The trial court suggested that defense counsel could accomplish

24

this  either through the testimony of a witness or by stipulation with the State.  This suggestion by the trial court is indicative and representative of the trial court's attempts throughout this trial  to provide some balance to the trial by guiding defense counsel through rudimentary trial procedures. Although the trial court made a great effort throughout the trial, it was to no avail.

In light of the case law we have reviewed, and the facts of this case, we find that defense counsel's representation was clearly inadequate and ineffective. Strickland v. Washington, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  As we have noted, to reverse a criminal conviction for ineffective assistance of counsel, the defendant must meet a two-pronged test: first, he must establish that his trial counsel's representation was ineffective; second, a defendant must establish that this ineffectiveness prejudiced him.  Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  We find that the first prong of that test is met in this case because defense counsel's conduct of the trial was so unprofessional that it clearly did not meet an objective standard of reasonableness.   Defense counsel manifested a lack of knowledge about fundamental facts of the case, and a lack of knowledge of basic principles of trial procedure.  This case is similar to People v. Bryant, 391 Ill. App. 3d 228, 907 N.E.2d 862 (2009), in which the first degree murder convictions of two codefendants were reversed for ineffective assistance of counsel.  In Bryant, defense counsel told the jury that he would produce witnesses to support the defense and then failed to produce a single witness. Defense counsel also failed to call the defendants to testify that they were asleep at the time when the murders occurred and that two other men woke them to tell them that they (the two other men) had committed the murders.  In his opening statement, defense counsel in Bryant related this account in detail and told the jury it would hear this directly from the defendants. But

then he never presented their testimony during the trial. Defense counsel also failed in his attempt to elicit evidence in support of his theory of defense during cross-examination of the State witnesses. He was repeatedly admonished by the trial court that his questions were beyond the scope of direct examination and that he would need to present his own witnesses to elicit the evidence he sought. Yet defense counsel did not present any witnesses. In finding that defense counsel's ineffective assistance prejudiced the defendants, the appellate court noted the weakness of the State's case, and that defense counsel in fact did not present a defense. Bryant, 391 Ill. App. 3d at 242-43, 907 N.E.2d at 875. Defense counsel's representation in this case is similar to that found to be ineffective in Bryant, because in both cases the trial court had to repeatedly guide defense counsel and correct the mistakes defense counsel made during his cross-examination. Bryant, 391 Ill. App. 3d at 233-34, 907 N.E.2d at 868. Also similar to Bryant is the weakness in this case of the identification testimony of the State's key witness. In Bryant, 391 Ill. App. 3d at 242-43, 907 N.E.2d at 875, the key witness was an admitted drug addict and an uncharged accomplice. In the case at bar, Deveaux's identification of the defendant was impeached and contradicted by his own statements prior to and during trial. Another case relevant to our analysis here is People v. Salgado, 263 Ill. App. 3d 238, 635 N.E.2d 1367 (1994), where the defendant was convicted of first degree murder, armed violence, and two counts of attempted murder. On appeal, the reviewing court found that the defendant trial's counsel had been so ineffective as to require a new trial. Counsel had failed to impeach the State's sole eyewitness, who had testified at previous trials of codefendants that he could not identify any of those who had committed the crimes, but at the defendant's trial claimed to be able to identify the defendant as one of the perpetrators. Salgado, 263 Ill. App. 3d at 246-47, 635 N.E.2d at 1373-75.

26

Although we have concluded that defense counsel's representation was ineffective under the first prong of Strickland, we must also determine whether, under the second prong of the test, that ineffectiveness prejudiced the defendant. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In cases where the State's evidence was weak and defense counsel's ineffective representation resulted in a failure to effectively challenge that evidence, Illinois appellate courts have held that prejudice to the defendant has been shown, so that reversal and remand for a new trial are required. People v. Wilson, 392 Ill. App. 3d 189, 201-202, 911 N.E.2d 413, 424 (2009); People v. Bryant, 391 Ill. App. 3d at 242-43, 907 N.E.2d at 875; People v. Spann, 332 Ill. App. 3d 425, 439-40, 773 N.E.2d 59, 72 (2002); People v. Anthony Roy W., 324 Ill. App. 3d 181, 186-87, 754 N.E.2d 866, 870 (2001). Thus in Anthony Roy W., 324 Ill. App. 3d at 186-87, 754 N.E.2d at 870, prejudice from ineffective assistance of counsel required reversal and remand where defense counsel, among other deficiencies, failed to challenge the credibility of the alleged victim, the State's crucial witness. Prejudice requiring reversal and remand has also been found where defense counsel fails to cross-examine a witness whose testimony could have severely weakened the prosecution's case. Spann, 332 Ill. App. 3d at 444, 773 N.E.2d at 75. Similarly, in the case before us, defense counsel's ineffective representation prevented the effective impeachment of the victim, who had identified an innocent man as one of his attackers and who persisted in that claim even at trial after the police had clearly established that man's innocence. This failure to adequately cross-examine, impeach, and test the credibility of the victim prejudiced the defendant. Thus, the second prong of Strickland has also been satisfied.

Prejudice requiring reversal and remand has also been found where defense counsel actually

elicits testimony which harms the defendant's case. People v. Bailey, 374 Ill. App. 3d 608, 614-15, 872 N.E.2d 420, 425-26 (2007) (on cross-examination of arresting officer, defense counsel elicited highly incriminating evidence against the defendant); People v. Moore, 356 Ill. App. 3d 117, 129-30, 824 N.E.2d 1162, 1173 (2005) (defense counsel elicited inadmissible hearsay evidence from State witnesses, which incriminated the defendant). In the case at bar, defense counsel impeached his own client, the defendant, by eliciting from him the admission that he knew one of his accomplices, Wilson, "very well," when the defendant had previously told the police that he did not know Wilson. Another factor which also contributes to a finding of ineffective assistance of counsel resulting in prejudicial and reversible error is the necessity of frequent intervention by the trial court to guide defense counsel through rudimentary trial procedures and to correct mistakes made by counsel. Bryant, 391 Ill. App. 3d at 233-34, 907 N.E.2d at 868. Here, defense counsel's lack of knowledge of fundamental aspects of his case required frequent intervention by the trial court, and even by the prosecutor, to try to correct counsel's misunderstanding.

In this case, the State's evidence of the defendant's guilt was weak. Yet, defense counsel failed to adequately bring out available evidence to impeach the victim, Deveaux, who was the sole eyewitness; did not properly prepare to examine his own client; was unfamiliar with crucial facts; and elicited evidence that incriminated his own client. Based upon all of these factors, we conclude that the ineffective assistance of defense counsel caused substantial prejudice to the defendant. We reject the notion that the indirect and unclear introduction of crucial evidence through other witnesses was sufficient to attack the key identification testimony of the victim on crucial points. Likewise, we disagree that the defects in counsel's representation were cured by his closing argument

in which he points out the weakness of the victim's identification. That was too late. Closing arguments are not evidence, and the jury was free to disregard those comments. Accordingly we must reverse the defendant's convictions and remand this cause for a new trial.

Because of our ruling on ineffective assistance of counsel, requiring reversal and remand, we do not reach the issue of whether it was error for the State to elicit testimony that a police officer spoke to Wilson, and then began searching for the defendant.

The defendant also contends that he was not proven guilty beyond a reasonable doubt and thus his convictions should be reversed outright. We will not engage in an extensive discussion of this final claim raised by the defendant, as we are reversing and remanding on other grounds. We agree that the defendant is entitled to a trial free from the ineffective assistance of counsel that occurred here. But suffice it to say that the testimony of Deveaux, if presented in a manner free of the ineffectiveness of defense counsel and if believed by the jury, was sufficient to establish the defendant's guilt. We will not substitute our judgment for that of the jury concerning the weight of properly presented evidence and the credibility of witnesses. People v. Campbell, 146 Ill. 2d 363, 375, 586 N.E.2d 1261, 1266 (1992). Thus, for purposes of double jeopardy analysis, we conclude that there was sufficient evidence to convict the defendant, although we make no finding concerning the defendant's guilt which would be binding upon his retrial. People v. Jones, 175 Ill. 2d 126, 134, 676 N.E.2d 646, 650 (1997).

For all of these reasons, we reverse the defendant's convictions and remand this cause to the circuit court for a new trial.

Reversed and remanded.

KARNEZIS, J., concurs.

THEIS, J., dissents.

JUSTICE THEIS, dissenting:

The majority concludes that trial counsel's representation fell below an objective standard of reasonableness in failing to adequately subject the State's case to meaningful adversarial testing and, as a result of his deficiencies, caused substantial prejudice to defendant. Although I concur in the majority's conclusion that trial counsel rendered deficient representation during the course of the trial, I respectfully dissent from the majority's holding that defendant was ultimately prejudiced by these deficiencies.

In order to prevail on a claim of ineffective assistance, a defendant must satisfy both the performance and the prejudice prongs of Strickland. People v. Evans, 209 Ill. 2d 194, 220 (2004). The majority acknowledges that the second prong of Strickland requires a showing that counsel's deficient performance resulted in prejudice, but fails to articulate or apply the standard by which a defendant must establish that prejudice. A defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. People v. Peeples, 205 Ill. 2d 480, 513 (2002). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial and not merely a possibility of a different result. Evans, 209 Ill. 2d at 220; Peeples, 205 Ill. 2d at 513. In making a determination of prejudice, the court must examine the totality of the circumstances and not isolated incidents. People v. Mitchell, 105 Ill. 2d 1, 15 (1984).

The majority essentially finds prejudice in counsel's failure on cross-examination to "clearly or unequivocally" challenge Deveaux's credibility and identification of defendant as one of his attackers by confronting him with the weaknesses in his identification, including his

misidentification of Hedley. Slip op. at 11. The majority points to counsel's inability to elicit "the core of the theory of defense" with "clarity," (slip op. at 20, 24) highlighting what it views as crucial missed opportunities for impeachment including: (1) that Deveaux had told that police that he was "100 percent" certain regarding his identification of Hedley as one of his attackers; (2) that the police had determined that Hedley was exonerated; and (3) that Deveaux continued to maintain the possibility that Hedley was the third attacker. The majority additionally points to counsel's failure to challenge Deveaux's inability to accurately and consistently identify his attackers and their respective roles.

Given these deficiencies, the majority then finds that prejudice resulted from the lack of clarity in counsel's representation. However, the record establishes that during trial, counsel indeed elicited these points through other witnesses. Detective Kelly specifically testified that Deveaux related to him that Deveaux was "100 percent certain" that Hedley was one of the offenders, that he was "face to face" with Hedley when he was shot, and that he could never forget his face. Counsel also elicited from Kelly that even though Kelly had "determined that the person who was identified was not, in fact, one of the offenders in the actual robbing and shooting," Deveaux "stated that he was still standing by his identification of the alleged offender." Thus, contrary to the majority's findings, counsel indeed elicited "the evidence which was the most devastating to Deveaux's account." Slip op. at 23.

Additionally, the jury was made well aware of the discrepancy between the description Deveaux originally gave to police of his attackers as being 5 feet 7 inches, and then 5 feet 11 inches, and defendant's actual height which was 6 feet 6 inches. Defense counsel also highlighted the length

32

of time between the offense and the identification and introduced the photograph of the lineup of June 15, 2005, in which Deveaux identified defendant, showing that defendant was several inches taller than the other individuals in the lineup.

Moreover, counsel strenuously argued these points in closing argument as follows:

"[N]ow they've investigated a guy who's about five/eleven, a little over six feet who the witness says is involved, he's sure, as one of the offenders. In fact, he's a hundred percent sure. I mean, what is this? Okay, now it turns out the guy couldn't possibly have done it. The police officers don't even bother investigating anymore and let him go because he couldn't possibly have done it.

The victim says he's still him. Clearly the victim wants someone to be responsible, so what does he do? Well, he throws away his five/eleven description and he looks at another line-up and says that's the person and he points out –he says there's the person. He doesn't care whether the person was five/eleven before, now the person is six/seven. It's a little bit of a difference between five/eleven and six/seven and he doesn't care because he wants somebody to be responsible ***."

Thus, based upon the totality of the record, the impeaching evidence was introduced through another witness, and defendant's theory of mistaken identity was indeed articulated to the jury in closing argument.

33

Additionally, the cases cited by the majority in support of its finding of prejudice are also distinguishable. Unlike the present case, in Anthony Roy W., counsel failed to present the jury with any evidence challenging the credibility of the victim. Anthony Roy W., 324 Ill. App. 3d at 186-87. In Wilson, the court found ineffective assistance of counsel where trial counsel failed to make any closing argument. Wilson, 392 Ill. App. 3d at 201-02. In Bryant, trial counsel completely failed to present any evidence to support his theory of defense after promising to present the jury with such testimony in opening statements. Bryant, 391 Ill. App. 3d at 242-43. In Spann, the court held that counsel was ineffective based upon the cumulative impact of counsel's failure to present a motion to dismiss the indictment, failure to present a motion to suppress evidence, failure to present an opening statement, failure to call any witnesses, failure to present any evidence, and failure to test the credibility of the State's only witness. Spann, 332 Ill. App. 3d at 439-40, 444. We are not faced with these unique circumstances in the present case.

For the foregoing reasons, I believe defendant has not met his burden to establish that, but for counsel's deficiencies, there is a reasonable probability the outcome of the trial would have been different. Deveaux never waivered from his testimony that defendant was the offender that he saw come out of the closet. I would affirm defendant's conviction and sentence.