THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD WILSON, Defendant-Appellant.

First District (1st Division)   No. 1—06—2072

Opinion filed June 8, 2009.

_____

GARCIA, J., concurring.

Patricia Unsinn and Kari K. Firebaugh, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Manny Magence, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

The defendant, Donald Wilson, and five codefendants, Darnell Wilson[1], Ahmed Poole, Derrick McNeal, Lester Perkins and Raymond Youngblood, were charged by indictment with first degree murder, attempted first degree murder, aggravated use of a firearm and aggravated battery with a firearm in connection with the deaths of Lesley Coppage and George Holliday, and the wounding of Melvin Jefferson.[2] Following a jury trial, the defendant was found guilty of two counts of first degree murder and aggravated battery with a firearm. The defendant was sentenced to concurrent terms of natural life and six years' imprisonment for the first degree murder and aggravated battery with a firearm, respectively.

On appeal, the defendant raises three issues: (1) whether trial counsel's failure to make a closing argument deprived the defendant of the effective assistance of counsel; (2) whether the admission of the photograph of and the testimony regarding a revolver unconnected to the shootings in this case was error; and (3) whether the trial court erred in granting the State's motion *in limine* to bar evidence that the victims and eyewitnesses belonged to a street gang.

---

[1]Darnell Wilson is the defendant's brother. His conviction stemming from this incident was affirmed by this court. See *People v. Wilson*, No. 1—06—1347 (December 8, 2008) (unpublished order under Supreme Court Rule 23). Mr. Youngblood's conviction was also affirmed by this court. See *People v. Youngblood*, No. 1—06—1997 (March 31, 2009) (unpublished order under Supreme Court Rule 23).

[2]The remaining codefendants are not parties to this appeal.

We conclude that the defendant was denied the effective assistance of counsel by the failure of trial counsel to make a closing argument and by trial counsel's failure to object to the admission of the evidence of the unrelated revolver. As this case must be remanded for a new trial, we do not reach the issue of whether the granting of the motion *in limine* was error.

## BACKGROUND

### I. Pretrial Proceedings

The jury selection in this case was presided over by Circuit Court Judge Joseph M. Claps. Judge Claps advised the prospective jurors that there was "a chance that some evidence in this case may show that there was some type of gang activity involved" and inquired whether that evidence would prevent any of them from being fair and impartial. Two jurors indicated that they could not be fair with regard to such evidence and were excused for cause.

Prior to trial, the prosecutor made an oral motion *in limine* seeking to bar any reference to the victims' and the eyewitnesses' gang membership. Initially, the motion was addressed in chambers. The discussion was then continued on the record prior to opening statements. Trial counsel opposed the motion, arguing as follows:

"It's our theory of defense in this case that the State witnesses are going to testify, Melvin Jefferson, Eddie Jackson, William Chambers, George Lawson, and others, in essence, conspired with each other to put forward Donald Wilson's name as being one of the perpetrators when, in fact, he was not.

Their connection to each other and to the deceased, Lesley Coppage and George Holliday, is relevant to show the nature of their bias, their motivation for testifying the way they do."

The trial court granted the motion to bar the gang evidence, stating as follows:

"I still go back to my original point which I said in chambers, and that is, I don't see the connection between the fact that people got arrested in that building, in that lobby, for whatever reason, between that and a possible conspiracy between them to frame somebody, simply because they were there.

I've said this and I'll say it on the record, in my opinion this is, at best, has some tangential relationship to a gang conflict, only because there were allegations that some of the people, some of the witnesses *** involved in this case were also members of a gang.

The fact is that they were members of the same gang. They just happened to be from a different building. In my opinion this is not a gang case. The rivalry is between buildings, between people who

were originally in Prairie Courts and ended up having to be forced to live in the Ickeys."[3]

## II. Jury Trial[4]

Corey Strothers testified that he resided with his family at 2310 South State Street (the 2310 building) in the Harold Ickes housing project (Ickes). At around 12:30 p.m. on June 26, 2003, accompanied by his daughters, he was on his way to the 2240 building to confront the parent of a child who had injured one of his daughters with a rock. On the way, the defendant passed him, carrying a brown paper bag. He had observed the defendant while working as a disc jockey at parties at the Prairie Courts housing project (Prairie Courts). The defendant walked to the back of 2250 building, which adjoined the 2240 building.

When Mr. Strothers reached the front of the 2240 building, Lesley Coppage and George Holliday were there. He saw them every day. George Lawson, Melvin Jefferson, Eddie Jackson and Nathan Wilson were also there. Mr. Strothers had known these individuals for about 10 years from Ickes.

As he was discussing his daughter's eye with Mr. Coppage, gunshots were heard from inside the lobby of the 2240 building. Mr. Strothers grabbed one of his daughters and pushed her out of the way. He fell over a bannister and remained on the ground. Mr. Holliday grabbed Mr. Strothers's other daughter to keep her from being hit, but then he was shot. There was a pause; Mr. Strothers heard more shots coming from the side and the back of the 2240 building. Mr. Strothers located his daughters and returned home.

Mr. Strothers testified further that, prior to the shooting, the people living in Prairie Courts were relocated to Ickes because Prairie Courts was scheduled to be torn down. Since then the atmosphere at Ickes had begun to change. There was a lot of violence. People were being attacked; as a result, they were afraid to go outside. Mr. Strothers admitted that he had been convicted of burglary and the delivery of a controlled substance.

On cross-examination, Mr. Strothers acknowledged that he did not see who came out of the lobby of the 2240 building or where they went. The defendant did not threaten him and did not have a gun. He did not see the defendant again.

---

[3]The State points out that the correct spelling is "Ickes."

[4]The defendant's jury trial was conducted simultaneously with the bench trials of Darnell Wilson and Ahmed Poole.

George Lawson testified that at approximately 1 p.m. on June 26, 2003, he was in front of the 2240 building. He was with Eddie Jackson, Melvin Jefferson, Corey Strothers and William Chambers. Lesley Coppage and George Holliday were also present. He had grown up with these men at Ickes and saw them every day.

Mr. Lawson was standing on the porch; a conversation was going on regarding Mr. Strothers's daughter. When he heard someone say, "There come the n-----s," he observed three individuals in the building lobby with guns. He identified the three men as the defendant, Suey and Be-Bo. Mr. Lawson heard shots and began to run. He heard more shots coming from the back of the 2240 building and ducked behind a white van. He was not able to see who was shooting. When he returned, he saw that Mr. Coppage and Mr. Holliday had been shot.

Mr. Lawson testified that he had observed the defendant around the 2320 building for about three months prior to the shooting. The defendant was with other individuals from the Prairie Courts project.

On cross-examination, Mr. Lawson acknowledged that there was bad blood between the men from Prairie Courts and the men at Ickes and that some fighting was going on. He also acknowledged that in his grand jury testimony, he stated that his attention was drawn to the lobby because of the gunfire. He did not talk to the police until the day after the shooting. While he told the detective who interviewed him a month after the shooting that he could identify all three men in the lobby, he only identified Suey and Be-Bo. He admitted testifying in another hearing that he saw the three men with guns, not that they fired them.

On redirect examination, Mr. Lawson testified that he identified all three of the men and gave a statement to that effect to the police. He further testified to that fact before the grand jury. On re-cross-examination, Mr. Lawson denied discussing the facts of the shooting with anyone prior to his interview with police.

Eddie Jackson testified that at about 1 p.m. on June 26, 2003, he was standing on the porch of the 2240 building with Messrs. Coppage, Holliday, Lawson, Strothers and Nathan Wilson. He was listening to the conversation regarding Mr. Strothers's daughter. He heard gunshots from inside the 2240 building and heard someone say, "Here they come. Here come those n-----s." Mr. Jackson looked into the building and saw the faces of the shooters; they were moving and firing their guns. He identified the shooters as Mr. Poole (Hot Dog), Suey, Be-Bo and Lester. There could have been more, but those were the men he saw. He did not testify that he saw the defendant in the building.

Mr. Jackson testified that as he ran toward the parking lot next to the 2240 building, the shooting stopped. As Mr. Jackson ran along side

the building, there was more shooting. He looked to his left. At this point, he observed three individuals. He identified them as Mr. Poole, the defendant and the defendant's brother, Darnell. The men were firing their guns and running toward Mr. Jackson and Mr. Coppage, who was running with Mr. Jackson. As Mr. Jackson and Mr. Coppage turned back to run to the corner of the parking lot, Mr. Coppage was shot. Mr. Jackson was able to hide until the police arrived.

Mr. Jackson had observed the defendant many times before; they both attended Dunbar High School. He had also seen him numerous times at Ickes.

On cross-examination, Mr. Jackson acknowledged that he was aware the police had taken the defendant into custody before he went to the police station. He knew the defendant and Darnell as "brothers." After he identified them in the lineup, the police told him their names. He did not remember telling police that he had seen four rather than three black males shooting at the back of the 2240 building. He never saw any of the shooters come out of the front of the 2240 building because he had started to run. He did see Mr. Poole coming from the back of the 2240 building.

Melvin Jefferson testified that he grew up with Suey and had known Be-Bo for over 10 years. He would see them when he lived at Prairie Courts. He saw the defendant with Suey and Be-Bo at Ickes.

Mr. Jefferson testified that between 12:30 p.m. and 1 p.m. on June 26, 2003, he was in front of the 2240 building with Messrs. Coppage, Strothers, Holliday, Jackson and Nathan Wilson. The group was talking about an incident between Mr. Strothers's daughter and another child when Mr. Jefferson heard the back door to the 2240 building open. He looked toward the front of the lobby and saw Suey and Be-Bo with guns in their hands. The men began shooting. Mr. Jefferson ran toward the parking lot north of the building. Mr. Coppage was running to the parking lot with him when he called out that he was hit. Mr. Jefferson hid behind a car with Mr. Lawson and Mr. Jackson; he discovered he had been shot in the leg. After looking at Mr. Coppage, he looked back up and saw three individuals running. He saw Darnell with a silver gun in his hand. Two other men were with him; the defendant and Mr. Poole. The men started shooting at Mr. Jefferson, Mr. Jackson and Mr. Lawson. Mr. Jefferson managed to get up and run. When he got to Cermak Road and State Street, a police car pulled up.

On cross-examination, Mr. Jefferson testified that the two men with guns in the lobby of the 2240 building were Mr. Youngblood, known also as "Suey," and Mr. McNeal, known also as "Be-Bo." He acknowledged that the transcript of his grand jury testimony did not reflect that he had hidden behind a van.

Anthony Hardy testified that he was currently serving a one-year sentence for violating the probation term he was given for possession of a controlled substance. On June 26, 2003, he was employed as a janitor at Ickes. He worked at the 2320 building south of the 2250 and 2240 buildings. He had worked at Ickes for 10 years and was very familiar with the area because he had grown up there.

Mr. Hardy testified that around 1 p.m. on June 26, 2003, he was in back of the 2320 building. He heard gunshots coming from the 2240 and 2250 buildings. About a minute later, he saw two individuals running toward the 2320 building from the back of 2240 and 2250 buildings. Only one of the individuals had a gun. He had described the gun to police as big and silver in color. Mr. Hardy identified Darnell as the individual with the gun. He did not notice where Darnell went as he was trying to get out of the way. He did not see the face of the other individual.

William Chambers acknowledged that he had a pending possession of a controlled substance charge but that no promises or threats were made to him for his testimony. He testified that between 12:30 p.m. and 1 p.m. on June 26, 2003, he was on the north side of the 2240 building in the parking lot with his friends, Messrs. Jackson, Jefferson and Holliday. Some of the group left the parking lot and went to the front of the 2240 building. Mr. Chambers remained in the parking lot. He heard gunshots coming from the front of the building and saw people running toward him. He began to run west and northbound. He also saw three individuals running down the lane in back of the 2240 building. One of the individuals held up a silver gun and started shooting at him; he recognized the shooter as Mr. Poole. The other two also started shooting. Another man was standing in back of the 2240 building shooting at him. Mr. Chambers identified him as Mr. Youngblood. On cross-examination, Mr. Chambers testified that he could not identify the defendant as one of the shooters because he did not see his face.

Officer William Sullivan, a forensic investigator for the Chicago police department, testified that he and his partner, Officer Ostafin, were assigned to process a crime scene at 2240 South State Street. Inside the lobby area, he recovered five nine-millimeter fired cartridge cases. Outside the lobby area, he recovered two nine-millimeter fired cartridge cases. In the parking lot north of the 2240 building, he observed a vehicle with a red stain on the hood directly in front of where the driver would sit. There was also a red stain to the rear of and about seven to eight feet north of the vehicle. Based on the officer's experience, the red stains were blood.

Officer Sullivan testified further that Officer Ostafin and he went to apartment 708 in the 2420 building. In the apartment, they were directed to a closet and retrieved a weapon, described as a Smith and Wesson six-shot, .45-caliber double-action bluesteel revolver with a 5½-inch barrel.

Chicago police officer Mark Struke testified that, on April 1, 2004, he was assigned to the 18th District Gang Team and was working at the Cabrini Green housing project. At approximately 11 p.m. on that date, he entered an apartment at Cabrini Green and recovered a weapon from a man attempting to place it under a refrigerator.[5]

Kurt Murray, a forensic scientist and an expert in firearm identification, testified that all of the fired cartridges came from the same weapon. He determined that the recovered cartridge cases were not fired from the revolver recovered by Officer Sullivan at the apartment in the 2420 building. He further determined that the cartridges came from the weapon recovered by Officer Struke.

Chicago police officer Mark Mayer testified that on June 23, 2003, he responded to a call of a person shot at Ickes. He was in plain clothes and driving an unmarked car. While driving down Dearborn Street behind the 2420 building, he observed the defendant walking toward the 2420 building at a fast pace. Officer Mayer conducted a field interview with the defendant. The officer noted that the defendant appeared very nervous. A pat down of the defendant did not reveal any evidence. While questioning the defendant, Officer Mayer observed a black male running toward West 24th Street. He left the defendant and stopped the other individual for a field interview.

On cross-examination, Officer Mayer acknowledged that the defendant did not try to run away. He stopped the defendant to obtain information; during their conversation, the officer realized the defendant was very nervous. Officer Mayer was accompanied by two partners; they all exited the car and approached the defendant.

Sergeant Ronald Watts testified that on June 26, 2003, he was assigned to Ickes. He responded to a call of shots fired at 2240 South State Street. After he arrived at the scene, he proceeded to apartment 708 in the 2420 building, where some of the people the police were looking for were believed to be located.

Officer Watts testified that a black female admitted him to the apartment. The woman did not identify herself, but he believed her

---

[5]Trial counsel moved for a mistrial based on Officer Struke's reference to being assigned to a gangs unit. The trial court denied the motion for mistrial and also refused trial counsel's request to admonish the jury that the fact the officer was assigned to a gangs unit had nothing to do with this case.

last name was "Wilson." Upon entering, Sergeant Watts observed two black males who identified themselves as the defendant and Darnell. The woman gave him permission to search the apartment; there was a revolver in the closet. The revolver was recovered by crime lab personnel. The defendant and Darnell were taken to Area 4 police district.

The defendant advised the trial court that he did not wish to testify. The parties stipulated that Officer Sullivan would testify further that the revolver he recovered from the apartment was loaded with six live cartridge cases. It was also stipulated that Melvin Jefferson would testify that he viewed a lineup on June 26, 2003, at 7:35 p.m. and identified the defendant, Darnell and Mr. Poole. The parties also stipulated that the defendant gave an address of 725 East Bowen, Chicago, to Officer Mayer.

The parties further stipulated that Detective William Whalen would testify that Mr. Jackson told him he had seen a person named "Be-Bo" come out of the building shooting a handgun. It was also stipulated that Mr. Hardy viewed a lineup in which the defendant and Darnell participated, but Mr. Hardy identified only Darnell. The defendant then rested. After the prosecutor made her closing argument, trial counsel informed the trial court that the defense chose to rely on the trial court's instructions to the jury. After conferring with trial counsel off the record, the trial court proceeded to instruct the jury. After the jury retired to deliberate, trial counsel moved for a directed verdict; the motion was denied.

The jury found the defendant guilty of two counts of first degree murder and one count of aggravated battery with a firearm. The defendant's motion for a new trial was denied. The trial court sentenced him to natural life imprisonment for first degree murder and six years' imprisonment for aggravated battery with a firearm. The defendant's motion to reconsider his sentence was denied. This appeal followed.

## ANALYSIS

### I. Ineffective Assistance of Counsel

The defendant contends that trial counsel's failure to make a closing argument denied him the effective assistance of counsel.

### A. *Standard of Review*

Where the facts surrounding the ineffective assistance claim are undisputed and the claim was not raised below, this court's review is *de novo. People v. Berrier*, 362 Ill. App. 3d 1153, 1167, 841 N.E.2d 1117 (2006).

### B. *Discussion*

"To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that prejudice

resulted from that deficiency." *People v. Bailey*, 232 Ill. 2d 285, 289, 903 N.E.2d 409 (2009), citing *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). "An attorney's performance must be evaluated from counsel's perspective at the time the contested action was taken and will be considered constitutionally deficient only if it is objectively unreasonable under prevailing professional norms." *Bailey*, 232 Ill. 2d at 289.

When determining whether an attorney's performance was deficient, a reviewing court indulges a strong presumption that the attorney's performance fell within the wide range of reasonable professional assistance. *Berrier*, 362 Ill. App. 3d at 1166. Under many circumstances, the waiver of closing argument is a matter of trial strategy. *People v. Conley*, 118 Ill. App. 3d 122, 127, 454 N.E.2d 1107 (1983). Our supreme court has recognized that " ' "[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent." ' [Citations.] In fact, counsel's strategic choices are virtually unchallengeable. [Citation.] Further, the fact that another attorney might have pursued a different strategy is not a factor in the competency determination. [Citation.]" *People v. Palmer*, 162 Ill. 2d 465, 476, 643 N.E.2d 797 (1994), quoting *People v. Hillenbrand*, 121 Ill. 2d 537, 548, 521 N.E.2d 900 (1988), quoting *People v. Stewart*, 104 Ill. 2d 463, 492, 473 N.E.2d 1227 (1984). In determining trial counsel's competence, the court must consider the totality of counsel's conduct, not isolated incidents. *People v. Spann*, 332 Ill. App. 3d 425, 430, 773 N.E.2d 59 (2002).

The State argues that trial counsel made a " 'virtually unchallengeable' " tactical decision to waive closing argument. *Palmer*, 162 Ill. 2d at 476. The State notes that in his opening statement, trial counsel alerted the jury to the fact that there would be inconsistencies in the testimony of the witnesses and that there was no physical evidence that would place the defendant at the scene of the murders. The State further notes that trial counsel vigorously cross-examined the witnesses and made a motion for directed verdict.

Finally, the State points out that the prosecutor's closing argument focused only on a review of the evidence and the anticipated jury instructions. The State maintained at oral argument that the choice not to make a closing argument was sound trial strategy designed to avoid a rebuttal argument by the prosecutor. Based on the totality of trial counsel's representation of the defendant, the State reasons that the representation did not fall below professional norms.

The United States Supreme Court observed:

"It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a

criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring v. New York*, 422 U.S. 853, 862, 45 L. Ed. 2d 593, 600, 95 S. Ct. 2550, 2555 (1975). Given that a criminal trial is a fact-finding process, "no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring*, 422 U.S. at 862, 45 L. Ed. 2d at 600, 95 S. Ct. at 2555.

Given the lack of Illinois case law on this issue, we find *Commonwealth v. Sparks*, 372 Pa. Super. 463, 539 A.2d 887 (1988), cited by the defendant, instructive. In *Sparks*, defense counsel chose not to make a closing argument, on the grounds that he believed that he " 'had the case won' " and that not making a closing argument implied to the jury that he " 'did not want to dignify the Commonwealth's case with a response.' " *Sparks*, 372 Pa. Super. at 467, 539 A.2d at 889.

The reviewing court concluded that trial counsel's failure to make a closing argument rendered his assistance constitutionally ineffective. The court pointed out that defense counsel had not made an opening statement to outline the defendant's case to the jury. In addition, the evidence was conflicting and included complex medical evidence. The court then stated as follows:

"Defense counsel's failure to comment thereon was in unfortunate contrast to [the] extensive closing argument made by counsel for the Commonwealth in which he offered plausible explanations for inconsistencies in the Commonwealth's evidence. Thus, when it began [its] deliberations, the jury had not had the benefit of any explanation by the defense of its version of the facts, while the Commonwealth's position had been presented forcefully and emphatically. Although defense counsel might personally have found the inadequacies of the Commonwealth's case to have been apparent, the assumption that they were equally obvious and memorable to the jury without comment by counsel was, under the circumstances ***, unreasonable and strategically lacking in merit." *Sparks*, 372 Pa. Super. at 468, 539 A.2d at 889.

In the present case, at the close of the evidence, the trial court informed the jury that the trial was not over; first the State and then the defense would have the opportunity to make final arguments. Thus, the jury was expecting to hear from the defense, and as noted earlier, the trial court appeared surprised that trial counsel chose not

to argue. Moreover, even with the barring of the gang evidence, trial counsel had the opportunity in closing argument to impress upon the jury the inconsistencies in the State's witnesses' identification testimony as well as the lack of a confession and the lack of any physical evidence connecting the defendant to the offenses in this case. In closing argument, the prosecutor told the jury that the witnesses' testimony placing the defendant at the scene should be considered as a whole and that the defendant was accountable for the codefendants' acts. That argument addressed the inconsistencies in the witnesses' testimony as to the defendant's presence at the scene and that he was one of the shooters. While trial counsel may have found the prosecutor's argument specious, the assumption that the jury did is unreasonable under the circumstances and not sound trial strategy. *Sparks*, 372 Pa. Super. at 468, 539 A.2d at 889.

It would be a rare case in which choosing not to make a closing argument in a jury trial would be sound trial strategy. Given the evidence here, this was not such a case. See *People v. McCarter*, 385 Ill. App. 3d 919, 935, 897 N.E.2d 265 (2008) (admission of impermissible opinion testimony was not susceptible to any strategic justification and fulfilled the first prong of the ineffective assistance test).

Although the defendant did not address the issue of the unconnected revolver in the context of his ineffective assistance of counsel claim, we find that the failure to object to that evidence further supports the first prong of the defendant's ineffective assistance claim. The State makes no argument that the testimony regarding the recovery of the revolver from the apartment and the photograph of the revolver was somehow connected to the charged offenses. See *People v. Babiarz*, 271 Ill. App. 3d 153, 160, 648 N.E.2d 137 (1995) (firearm is not admissible where the evidence establishes that the recovered firearm, even if sufficiently connected to the defendant, was not used in the commission of the offense). In fact, we find no connection.

In order to fulfill the second prong of the ineffective assistance of counsel test, the defendant must establish that "the probability that counsel's errors changed the outcome of the case is 'sufficient to undermine confidence in the outcome.' " *McCarter*, 385 Ill. App. 3d at 935, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The defendant need not prove by a preponderance of the evidence that the outcome would have been different; "rather, the defendant need only demonstrate that ' "there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " *McCarter*, 385 Ill. App. 3d at 935, quoting *People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d

1246 (1984), quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. In assessing the impact of counsel's errors, the reviewing court considers the totality of the evidence before the fact finder. *McCarter*, 385 Ill. App. 3d at 935-36.

Turning first to the error in admitting the evidence of the unconnected revolver, the defendant argues that the improper admission of the evidence pertaining to the revolver was highly prejudicial because it suggested that he was a dangerous person, citing 2 J. Strong, McCormick on Evidence §212, at 8 (5th ed. 1999). The State responds that the trial testimony made it clear that the revolver was not the murder weapon and that when stopped by Officer Mayer, the defendant did not have a gun in his possession. However, there was testimony that, shortly after the shootings, the revolver was recovered from a closet in the same apartment where the defendant was found by police.

There was no physical evidence connecting the defendant to the shootings. At the very least, admission of a photograph of and the extensive testimony about a revolver, unrelated to the shootings in this case, would have puzzled the jury as to why it was part of the evidence admitted against the defendant. At worst, the evidence that the defendant was found in close proximity to the revolver may have suggested to the jury that the defendant was a dangerous person and therefore more likely to have participated in the shootings.

The error was even more prejudicial to the defendant in light of trial counsel's failure to make a closing argument. Not only was there no physical evidence linking the defendant to the shootings, but the defendant made no inculpatory statements. The only evidence against the defendant was the testimony of some of the State's witnesses identifying him as one of the shooters.

The defendant's conviction in this case came down to whether the jury believed the identification testimony of the State's eyewitnesses to the shootings. Unlike *Sparks*, trial counsel did make an opening statement. However, in this case, the defendant was prejudiced by the failure of trial counsel to confirm to the jury that the inconsistencies referred to in trial counsel's opening statement were present in the witnesses' testimony. This is especially true in light of the prosecutor's closing argument to the jury that appeared to reconcile those inconsistencies. Trial counsel could also have argued to the jury the bias of those witnesses against the defendant based on the evidence of the ill-will between the Ickes and the Prairie Courts residents. Closing argument would also have afforded trial counsel the opportunity to remind the jurors that the revolver, about which they had heard so

much, was not evidence of the defendant's participation in the shootings. Clearly, trial counsel gave up the "last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring*, 422 U.S. at 862, 45 L. Ed. 2d at 600, 95 S. Ct. at 2555.

The State's reliance on *Palmer* and *People v. McGee*, 222 Ill. App. 3d 92, 583 N.E.2d 603 (1991), is misplaced. In both cases, the reviewing courts rejected arguments that failed trial strategies constituted ineffective assistance of counsel. However, "if no reason is or can be given for a tactic, the label 'tactic' will not prevent it from being used as evidence of ineffective assistance of counsel." *Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001), *vacated*, 268 F.3d 485 (7th Cir. 2001).[6]

In *Miller*, the court of appeals identified several errors committed by trial counsel. In determining that the prejudice to the defendant required a new trial, the court observed that if he had been represented by a minimally competent attorney, the defendant would have had a "reasonable shot at acquittal." *Miller*, 255 F.3d at 459. Conceding, however, that acquittal was far from certain, the court stated as follows:

> "[I]indeed, we think the chance of an acquittal would still have been significantly less than 50 percent; but it would not have been a negligible chance, and that is enough to require us to conclude that the lawyer's errors of representation were, in the aggregate, prejudicial." *Miller*, 255 F.3d at 459-60.

Given the evidence in case before us, the defendant's chance of acquittal was not negligible.

We conclude that the defendant received the ineffective assistance of counsel in that trial counsel's performance was deficient and resulted in prejudice to the defendant. As the defendant must receive a new trial, we need not turn to the granting of the State's motion *in limine*.

## II. Double Jeopardy

The defendant has not raised a challenge to the sufficiency of the evidence. We find that the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt and, therefore, double jeopardy does not bar a retrial. See *People v. Junior*, 349 Ill. App. 3d 286, 293, 811 N.E.2d 1267 (2004).

---

[6]The court of appeals refused to dismiss the appeal since it had been decided but did modify the remand order.

### III. Conclusion

For all of the foregoing reasons, the defendant's conviction is reversed, and the cause is remanded for a new trial.

Reversed; cause remanded.

R. GORDON, P.J., concurs.

JUSTICE GARCIA, concurring:

I write separately to cast further doubt that defense counsel's decision to forego closing argument may be properly characterized as a "virtually unchallengeable tactical decision," as the State claims in its brief. As Justice Hall points out, there is very little Illinois case law addressing this precise issue in the context of a jury trial for a very good reason: it ought to be a *rare* case where the failure to give a closing argument before a jury may constitute sound trial strategy. Even if such a case exists, this is not that case.

The jury heard from the defendant after the State gave its opening statement before the jury. In his opening statement, defense counsel raised questions as to the reliability of the anticipated testimony against the defendant. At the close of evidence, the trial judge, being unaware that defense counsel intended to waive closing argument, informed the jury that it would hear from the State first, then the defense, and again from the State. The State addressed the jury. The jury, then expecting to hear from the defense, instead, saw the attorneys for each side engage in a sidebar with the trial judge, after which the jury was instructed on the law. Defense counsel made no request of the trial judge to admonish the jury that just as the defendant had a right to not testify without giving rise to an adverse inference, in the same manner, he could waive his right to address the jury. See *People v. Bannister*, 232 Ill. 2d 52, 92, 902 N.E.2d 571 (2008) ("The jury was also specifically instructed not to consider the defendant's failure to testify in arriving at its verdict"). The jury was told nothing about the defendant's decision not to give a closing argument.

Of course, the State made good use of its opening closing argument. It highlighted the testimony of the only witnesses, Jefferson and Jackson, that claimed to have seen the defendant actively participate in the shootings. Certainly, if the jury believed the testimony of Jefferson or Jackson, that testimony was sufficient to prove the defendant guilty beyond a reasonable doubt. See *People v. Tabb*, 374 Ill. App. 3d 680, 692, 870 N.E.2d 914 (2007) ("If trustworthy, a single positive eyewitness identification may be sufficient proof of

guilt"). The State argued for their credibility; defense counsel offered nothing in response.

I agree that in the context of this case, in light of the conflicting nature of the evidence, where only two of numerous witnesses presented by the State identified the defendant as a shooter, defense counsel's decision not to present a closing argument was "objectively unreasonable under prevailing professional norms [of our criminal courts]." *People v. Bailey*, 232 Ill. 2d 285, 289, 903 N.E.2d 409 (2009). Defense counsel was ineffective when she gave up "the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring v. New York*, 422 U.S. 853, 862, 45 L. Ed. 2d 593, 600, 95 S. Ct. 2550, 2555 (1975). The closeness of the evidence compelled not only a closing argument by defense counsel, but provides the basis to find that defense counsel's decision to forfeit a closing argument so prejudiced the defendant that a new trial must be granted. See *People v. Brown*, 358 Ill. App. 3d 580, 595, 831 N.E.2d 1113 (2005) (but for counsel's shortcoming, reasonable probability exists that the result of the proceeding could have been different).