# Illinois Official Reports

## Appellate Court

---

### *People v. Pratt*, 2020 IL App (1st) 161085

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEJUAN PRATT, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-16-1085 |
| Filed | March 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-19727; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and S. Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justice Harris concurred in the judgment and opinion.<br>Justice Cunningham specially concurred, with opinion. |

## OPINION

¶ 1 Following a jury trial, defendant, Dejuan Pratt, was convicted of two counts of first degree murder, two counts of armed robbery, and one count of aggravated arson. He was sentenced to natural life in prison for the murders and a consecutive term of 30 years for both armed robbery and aggravated arson. On appeal, defendant contends that he was denied effective assistance of counsel when defense counsel did not give a closing argument.

¶ 2                              BACKGROUND

¶ 3 Defendant was charged with two counts of first degree murder, two counts of armed robbery, and one count of aggravated arson in relation to the deaths of the two victims: Chunxiao "Cathy" Lee and Gary Brown.

¶ 4 During opening statements, defense counsel repeatedly told the jury what they would "hear" at trial. On one occasion, she stated,

> "Each of you said you would not hold it against [defendant] if he chose not to testify. That is his right. He doesn't have to. And you cannot hold it against him but you're going to hear from him. You're going to hear what happened to him that day. On August 28, 2012."

¶ 5 At trial, Mary Mellott testified that she was roommates with Lee in college in 2009. Lee was in her forties at the time and had mentioned an acquaintance named Gary Brown. Lee's parents and brother lived in China.

¶ 6 Carol Szynal testified that she had been married to Brown for 27 years before their marriage ended in 1999. They shared three children together. Szynal testified that Brown went to Indiana University and eventually became an assistant state's attorney in Kankakee County. Brown later began teaching technology classes at the Howard Area Community Center and was working in that capacity in August 2012. Szynal testified that Brown lived at the time in an apartment with two roommates—one of which was an Asian female.

¶ 7 Jean Saour testified that he lived with Lee and Brown on August 28, 2012. He was not at the apartment often because of his work schedule. Saour testified that the week before the murders, on or about August 23, 2012, defendant moved into the apartment. Saour testified that he came home from work one evening and defendant was in the apartment. He asked defendant what he was doing there, and defendant responded that he was the new roommate.

¶ 8 Saour testified that in the early morning hours of August 28, 2012, at approximately 4 a.m., he received a phone call from his boss. About 5 to 10 minutes later, defendant knocked on his door and then opened it and told Saour that he wanted to give Saour a toothbrush. Saour testified that defendant told him he wanted to give him a toothbrush because defendant dropped some "poison" in the bathroom. Defendant then left the room. Saour testified that defendant's actions were not normal, so he left for work without brushing his teeth, taking a shower, or going to the bathroom.

¶ 9 Saour testified that the distance from his bedroom to Brown's bedroom was just over 35 feet. He did not hear any sounds coming from Brown's room on the morning in question. The distance from Brown's room to the backdoor, through the kitchen, was about four to five feet. When Saour returned home that evening, he saw an ambulance and fire trucks at the apartment building. He later learned from a detective what happened.

¶ 10	Thomas Connelly testified that he had been a lieutenant for the Chicago Fire Department for 29 years. He testified that at 4 p.m. on August 28, 2012, he responded to a fire at 6438 North Sacramento Avenue in Chicago. Lieutenant Connelly testified that while fighting the fire, he noticed something on one of the beds and one of his crew members saw "something on the floor of the same bedroom." Lieutenant Connelly testified that they discovered two bodies with multiple stab wounds. They called the police.

¶ 11	Ahmed Jaafar testified that on the date in question, he lived in apartment 2A, the apartment directly below Brown and Lee's apartment. At 4 p.m. on August 28, 2012, Jaafar was with his family when he heard something fall onto the ground. Jaafar testified that he and his family stayed quiet and then they heard the fire alarm in the hallway. Jaafar looked upstairs and could see a lot of smoke coming from the apartment above his. Jaafar called 911 before knocking on his neighbor's door. The fire department arrived a few minutes later.

¶ 12	Abdulatif Isaak testified that he was living in apartment 3W at 6438 North Sacramento Avenue on the date in question. His apartment was across the hall from apartment 3E, Brown and Lee's apartment. Isaak testified that he did not know the names of the occupants of apartment 3E but recognized their faces. At approximately 8 a.m. on the morning in question, Isaak went downstairs to his brother-in-law's first-floor apartment. As Isaak was leaving the apartment, he saw a black man with dreadlocks tied in the back coming down from the third floor. The two men said hello to each other as they passed.

¶ 13	Dr. Ponni Arunkumar testified that he was a deputy medical examiner. He testified as an expert in the field of forensic pathology. Dr. Arunkumar testified that on August 29, 2012, he performed an autopsy on both Brown and Lee. Dr. Arunkumar testified that there were approximately "105 stab and incised wounds that were present on [Lee's] body." Dr. Arunkumar testified that there were no traces of carbon dioxide in Lee's system, indicating that the fire did not contribute to her death. Dr. Arunkumar testified that Lee died from multiple stab wounds and incised wounds and that the manner of her death was homicide.

¶ 14	Dr. Arunkumar further testified that Brown suffered 83 stab and incised wounds. There was no carbon dioxide in Brown's blood, indicating that the fire did not contribute to his death. Dr. Arunkumar testified that Brown died from multiple stab and incised wounds and that the manner of death was homicide.

¶ 15	The parties then stipulated to the following:

"1. On August 28, 2012, [defendant] was residing at 6438 North Sacramento Avenue, apartment number 3E, Chicago, Illinois.

2. That at approximately 4:14 a.m. on August 28, 2012, [defendant] used his cell [phone] to call the Chicago Police Department's emergency call center and reported that he had been out running and had been attacked by three male offenders, and that he had been stabbed in the thumb. This call was accurately recorded by the 911 center. People's Exhibit No. 70 is an audio disc containing an accurate copy of the 911 call made by [defendant] on August 28, 2012.

3. That Lincolnwood Fire Department and Police responded to the address of 3420 West Devon Avenue, Lincolnwood, Illinois. The address of 3420 West Devon is about 7/20s of a mile from 6438 North Sacramento Avenue in Chicago. Lincolnwood paramedics arrived at about 4:23 a.m.

Paramedic Keith Dawson spoke with [defendant], observed a cut to [defendant's] left thumb. Paramedic Dawson asked [defendant] what happened and [defendant] stated that he had been out for a jog when he was attacked by some people. [Defendant] told paramedic Dawson that as he was running away from the attackers, he realized he had been cut.

Paramedic Dawson treated [defendant] for a laceration to [defendant's] left thumb and transported him to Saint Francis Hospital.

If called to testify paramedic Dawson would identify [defendant] as the man he spoke with, treated and transported to Saint Francis Hospital in the early morning hours of August 28, 2012."

¶ 16 It was further stipulated that defendant was treated at the hospital by Dr. Boylan and during that treatment, defendant told Dr. Boylan that he had been out for a run when two assailants attacked and tried to rob him. Dr. Boylan cleaned the wound and closed the laceration with seven sutures. Dr. Boylan would identify defendant as the man he spoke with and treated for a laceration to the thumb during the early morning hours of August 28, 2012.

¶ 17 It was further stipulated that Chicago police officers Carlos Santiago and Frederico Coletta were dispatched to the hospital on the morning of August 28, 2012, to take a report of defendant's incident. Defendant told them that three Hispanic men approached him in an aggressive manner and one of them stepped in front of him, so he grabbed the offender's shirt to use him as a shield from the other two attackers. Defendant told the officers that he was able to push the offender away and run to 3420 West Devon Avenue, where he met with police and paramedics. Defendant stated that during the struggle his left thumb was cut. He stated that while he did not see it, he assumed the offenders had a knife. Defendant could not provide any further description of the offenders beyond that they were Hispanic. It was also stipulated that defendant was released from the hospital at 7:18 a.m.

¶ 18 The parties also stipulated that defendant was enrolled at Roosevelt University and opened a Roosevelt University Mastercard Higher One (Higher One) debit account, with a home address in Columbus, Ohio.

¶ 19 The parties stipulated that Lee maintained a checking and savings account with Chase Bank. On August 22, 2012, Lee had a balance of $6.70 in her checking account and $25,113.86 in her savings account. The following records were changed by way of an outside computer on August 26 and August 27, 2012. At 7:13 p.m., the access password for the accounts was changed. At 7:30 p.m., the contact information for the accounts changed from cathylee@yahoo.com to leecathy2012@gmail.com. At 7:25 p.m., the accounts' overdraft coverage was changed. At 7:44 p.m., $20,000 was transferred from Lee's savings account into her checking account. Between 1:31 a.m. and 1:44 a.m., Lee's account was accessed from an outside computer and an order was placed to wire transfer $9800 from Lee's account to defendant's Higher One account.

¶ 20 It was further stipulated that on September 21, 2012, and September 22, 2012, a representative for Discover was contacted by phone with inquiries concerning the use of Lee's Discover credit card. The caller was having difficulty using the card and needed assistance. People's Exhibit No. 74, which was published to the jury, contained a thumb drive with the recordings of the conversations from the calls made to Discover representatives. The calls made to Discover originated from defendant's cell phone. Defendant, in a series of five phone calls, claimed first that he was a friend of Lee's calling on her behalf because she had trouble

speaking English, then that he was Lee herself, but had lost his voice, and then again that he was Lee using a woman's voice. He called two more times but failed to answer the security questions correctly.

¶ 21 The parties stipulated that on September 19, 2012, defendant used Lee's Discover card to purchase airfare to Las Vegas and a hotel stay at the Venetian in Las Vegas for $1676.97. Defendant stayed at the hotel from September 20, 2012, to September 23, 2012, returning to Chicago on September 24, 2012. In addition to these charges, there were other charges to Lee's card after her death, including Amazon purchases and cash advances. Lee's Discover card was found in defendant's possession upon his arrest on September 24, 2012.

¶ 22 It was also stipulated that after Lee's death, two checks were written from her TCF Bank account made out to defendant. One was for $175, and the other was for $475.

¶ 23 The parties further stipulated that Brown maintained a US Bank checking account with an associated debit card. After his death, three charges were made to that account, all dated September 21, 2012, for "in-suite dining" at the Venetian hotel. Brown's US Bank card was also found in defendant's possession upon his arrest.

¶ 24 Detective Russel Egan testified that defendant was arrested on September 24, 2012, upon his return from Las Vegas. As he was being arrested, defendant dropped a US Bank card belonging to Brown. Following a search of his person, officers found an additional Discover credit card belonging to Lee, a mutual fund statement in Lee's name that totaled $38,413.54, and an "odometer closing statement" in Lee's name for her 2003 Acura. The State put into evidence a letter drafted by defendant requesting the purchase of Lee's car for $2500, which was signed and notarized, to be subsequently transferred to defendant.

¶ 25 Detective Egan testified that he searched the new apartment where defendant was staying and found several documents bearing Lee's name. It was stipulated that if Sandra Videkic, a tenant of that apartment, was called to testify, she would state that in August and September 2012, she placed an ad in Craigslist looking for a roommate to share the rent and that in early September, defendant responded to her ad. Videkic would testify that defendant moved in on September 10, 2012, and that he took a trip to Las Vegas a couple weeks later. She did not see him again.

¶ 26 Detective Egan testified that he advised defendant of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) after defendant's arrest. Defendant was in the interview room overnight but was not interviewed. People's Exhibit No. 114 is the video of the initial interview detectives conducted with defendant, which was published to the jury. After defendant waived his rights, he admitted to stealing one of Lee's credit cards but did not think that was so bad that it necessitated the police meeting him at the airport to arrest him. Defendant stated that he had gone to Las Vegas and used Lee's card there. Defendant stated that Lee had given him a bag and the card was in there, but he never thought to give it back. Defendant admitted that he also took Brown's card when it was in the living room of their apartment. Defendant also stated that he fixed Lee's car and that Lee had said if he fixed the car, he could keep it. Defendant stated that he initially met Lee online through Craigslist and contacted her August 23, 2012. Defendant stated that a couple days later, he was out running between 5:30 a.m. and 6 a.m. when three Hispanic men tried to surround him. Defendant stated that he called 911 after getting hurt and was transported to the hospital where he received stitches.

¶ 27 Defendant stated that after he was released from the hospital, he went back to the apartment. Later that day, he hung out with a friend and returned late at night. Defendant stated

that, the next day, he and Lee played tennis and that defendant told her he was going to move out. He stated that upon moving out, Lee gave him some of his money back. He then went to stay at a friend's house.

¶ 28      Defendant denied knowledge of the fire in the apartment. Detectives told defendant that Lee had died, and defendant stated, "So now I'm running around using—well, I used two dead people's credit cards."

¶ 29      Detectives told defendant that they knew he had called 911 at 4:10 a.m. on August 28, 2012, and that the fire was later that evening. When confronted with why he was running at 4 a.m., defendant stated, "It's not looking good for me at all."

¶ 30      Defendant further stated that he had not been in Lee's Acura since the day he fixed it. When asked about her bank statements in his bag, defendant stated that it was "just mail" and he had taken it from the mailbox because Lee did not check it often. Detectives noted that the "mail" was from 2011 and that it was still in his bag. Defendant stated, "I mean, nothing looks good for me right now, right?"

¶ 31      After a break, defendant changed his story. He told detectives that another man was involved and that he forced defendant to sit and watch. Defendant stated that he got home late from the beach, and someone knocked on the backdoor. He let that person in sometime after midnight. The man asked defendant whether Lee or Brown was home and stated that they were expecting him. Defendant stated that the man went into Brown's room and asked him where the key was and Brown said he did not know. The man told Brown to stop lying. Defendant stated that the man reached behind his back and pulled out a very big knife and told Brown not to lie to him. Defendant stated that Brown had a safe and whatever was in there, the man wanted.

¶ 32      Defendant stated that the man put a knife in Brown's face and told him not to lie. The man stabbed Brown "a few times." While swinging the knife, the man contacted defendant's thumb. Defendant stated that as Lee walked past the door, the man pulled her into the room. Defendant thought Lee knew the man through Brown. The man asked Lee for the key. Defendant stated that he retrieved the key from Lee's room and returned to Brown's room. The key opened the safe and the man shuffled through it but did not find what he was looking for. The man then started stabbing Brown and Lee. Defendant stated that he then ran out the backdoor and down the steps. He admitted that he called the police and told them he had been attacked on a run, but it was only because he wanted help to reach him quickly.

¶ 33      Defendant stated that he did not tell the police about the intruder. After he got back from the hospital, the apartment was "just tore out." The bodies were in Brown's room, and he saw them covered up. Defendant stated that he grabbed his stuff and left, which is how he ended up with the Acura. He stated that he took the cards and bank statements before the murders. He stated that he put his clothes in a garbage can in an alley.

¶ 34      The parties stipulated that if Elaine Harrison were called to testify, she would state that she moved into apartment 3 at 6150 North Hoyne Avenue and, while doing some cleaning on December 21, 2012, she found a box on a shelf in the closet of one of the bedrooms containing a birth certificate belonging to defendant, a TCF Bank personal check drawing from Lee's account on August 29, 2012, made payable to defendant, a TCF Bank personal check drawn on Lee's account made payable to defendant on September 1, 2012, and an attorney badge bearing Brown's name on it. The box and its contents were turned over to the Chicago police.

¶ 35      Detective Joseph Marszalec testified that he was assigned to investigate the murders and that on September 25, 2012, he met with defendant and conducted a videotaped interview. The video was published to the jury.

¶ 36      The following exchange then took place between the trial court and defendant:

> "THE COURT: [Defendant], I need to ask you a few questions. *** first off, we're in what we call the defense case in chief, which means that there could be witnesses called during your part of the trial. Your attorneys, now they make the decision whether or not to call witnesses. But did you talk to [defense counsel] about whether or not you wish to have any witnesses called?
>
> [DEFENDANT]: Yes, sir.
>
> THE COURT: And do you agree with their decision not to call any witnesses?
>
> [DEFENDANT]: Yes.
>
> THE COURT: Now, [defendant], you have a right to testify in this matter and that right is yours and yours alone. Your attorneys can suggest to you or tell you whether they think it's preferable or advantageous for you to testify or not, but they cannot make that decision for you. Do you understand that?
>
> [DEFENDANT]: Yes, sir.
>
> THE COURT: By resting now, do you understand you *** will not be testifying in this matter?
>
> [DEFENDANT]: Yes.
>
> THE COURT: Do you desire to testify?
>
> [DEFENDANT]: No.
>
> THE COURT: And you have made that decision after talking with your attorneys in this matter?
>
> [DEFENDANT]: Yes."

¶ 37      The State made a closing argument and defense counsel did not. The trial court asked defense counsel, "did you tell your client you were going to do that?" Defense counsel answered that she did. The trial court asked defendant, "Did [defense counsel] talk to you about that?" Defendant answered, "Yes." The trial court noted that the decision was defense counsel's choice, and defendant responded, "Yeah." The trial court then asked if defendant was surprised by her decision, and defendant answered, "No." The trial court then asked defendant if he agreed with defense counsel's decision, and he responded, "Yeah."

¶ 38      The jury found defendant guilty of the first degree murders of Lee and Brown, armed robbery, and aggravated arson. Defendant filed two motions for a new trial, neither of which alleged that it was error for defense counsel to waive closing argument. After hearing arguments, the trial court denied the motions for a new trial, stating that it believed "the jury's verdict was consistent with [its] application of the law to the extreme amount of evidence that was introduced both directly inculpating the defendant and also with regard to the statement as introduced and the defendant's testimony himself in this matter."

¶ 39      At sentencing, the trial court heard arguments in mitigation and in aggravation. It then stated that defendant:

> "brought this despair to everyone in this courtroom. There's no doubt in my mind. How an individual can travel from one state to another within one month, be the only person

that walks out of an apartment alive leaving two individuals bloodied and dead while going out and subsequently manipulating finances, chilling in Las Vegas while the investigation is continuing is totally beyond me. It stretches my faith in humanity and frankly it repulses everyone who is law abiding.

The coldness of these murders, the barrenness of consciousness is something that is un—un-perceivable frankly. I mean, consciousness is like a desert wind where it just blows and there's nothing to it. The crime itself, a person committing that crime would have to have blood that was chilled at the coldest amount of temperature one could imagine."

¶ 40 The trial court sentenced defendant to natural life in prison without the possibility of parole. Defendant now appeals.

¶ 41                                          ANALYSIS

¶ 42 On appeal, defendant contends that he received ineffective assistance of counsel when defense counsel failed to give a closing argument. Defendant contends that defense counsel's failure to give a closing argument was especially unreasonable because defense counsel had promised in her opening statement that defendant would testify. Defendant's argument is that defense counsel should have used closing argument to explain why defendant did not testify and that defense counsel's failure to give a closing argument therefore constituted ineffective assistance of counsel. The State maintains that defense counsel's choice to waive closing argument constituted trial strategy.

¶ 43 "To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that prejudice resulted from that deficiency." *People v. Bailey*, 232 Ill. 2d 285, 289 (2009) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "An attorney's performance must be evaluated from counsel's perspective at the time the contested action was taken and will be considered constitutionally deficient only if it is objectively unreasonable under prevailing professional norms." *Id.* In order to establish the deficient-performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate "that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *Id.* Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432 (1999).

¶ 44 The defendant must also show that he was prejudiced by counsel's deficient performance, which means that there must be a reasonable probability that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *People v. Brown*, 2015 IL App (1st) 122940, ¶ 47. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Id.* ¶ 77. Failure to establish either prong precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 45 We begin our analysis by highlighting that, "[u]nder many circumstances, the waiver of closing argument is a matter of trial strategy." *People v. Wilson*, 392 Ill. App. 3d 189, 198 (2009) (citing *People v. Conley*, 118 Ill. App. 3d 122, 127 (1983)); see also *People v. Shoemaker*, 358 Ill. App. 3d 257, 260-62 (2005); *People v. Carter*, 132 Ill. App. 3d 523, 530 (1985). In fact, "waiving argument may have the advantage of preventing an impassioned

rebuttal argument by the prosecutor." *Shoemaker*, 358 Ill. App. 3d at 260-61 (citing *Bell v. Cone*, 535 U.S. 685, 701-02 (2002)); see also *Conley*, 118 Ill. App. 3d at 128 (defense counsel waived closing argument in order to preclude the State from offering any rebuttal; court found decision was a question of trial tactics).

¶ 46    We find *Carter* to be instructive. In that case, the defendant was convicted by a jury of rape, deviate sexual assault, and two counts of armed robbery. *Carter*, 132 Ill. App. 3d at 526. The opinion contains a short discussion on whether counsel was ineffective for waiving closing argument, stating:

> "In the case at bar, it is clear the decision by counsel to waive closing argument was a decision of trial tactics. Through that device, the prosecution was denied the opportunity for any rebuttal, which may have proved more damaging than any defense. Furthermore, our perusal of the entire record indicates that defendant was not only afforded adequate representation, he was afforded excellent representation. Defense counsel conducted effective cross-examination in an attempt to shake the identification testimony of the victims. Defense counsel also presented important motions and argued them passionately. We find no conceivable error here." *Id.* at 530.

¶ 47    As in *Carter*, we find that defense counsel's decision to waive closing argument was a decision of trial tactics that denied the prosecution an opportunity for a damaging rebuttal. Our review of the entire record in this case reveals that defendant was afforded excellent representation. Defense counsel conducted effective cross-examination and provided meaningful adversarial testing of the State's case.

¶ 48    Defendant nevertheless maintains, relying on *Wilson*, that the failure to give a closing argument amounted to ineffective assistance of counsel. *Wilson*'s underpinnings are suspect. In *Wilson*, the court stated that the defendant's conviction came down to whether the jury believed the identification testimony of the State's witness, and counsel gave up his best opportunity to challenge that evidence by waiving closing argument. *Wilson*, 392 Ill. App. 3d at 201. The *Wilson* court cited *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008), to support the following proposition: "It would be a rare case in which choosing not to make a closing argument in a jury trial would be sound trial strategy." *Wilson*, 392 Ill. App. 3d at 200. However, *McCarter* held that the admission of impermissible opinion testimony was not susceptible to any strategic justification and therefore fulfilled the first prong of the *Strickland* test. *McCarter*, 385 Ill. App. 3d at 935. It did not discuss closing arguments or whether waiver of closing argument was trial strategy. While the *Wilson* court further stated that there was a "lack of Illinois case law on this issue" (*Wilson*, 392 Ill. App. 3d at 199), there existed at the time an Illinois case directly on point—*Carter*. Instead, *Wilson* looked to a Pennsylvania case, *Commonwealth v. Sparks*, 539 A.2d 887 (Pa. Super. Ct. 1988), to aid its analysis. However, "where there is Illinois law on point, we need not, and should not, look to cases from other jurisdictions." *People v. Rodriguez*, 2019 IL App (1st) 151938-B, ¶ 28; see also *People v. Qurash*, 2017 IL App (1st) 143412, ¶ 34. Accordingly, we find the analysis in *Wilson*, which relies heavily on a case outside of Illinois, to be unpersuasive.

¶ 49    Even if we were to find *Wilson* to be persuasive, it is distinguishable from the case at bar. In *Wilson*, the defendant was convicted by a jury of first degree murder and aggravated battery with a firearm. The primary issue at trial was the identity of the men who shot the victims. *Wilson*, 392 Ill. App. 3d at 192-97. One witness who identified the defendant as a shooter had, in prior testimony and interviews, identified only two other men or had said only that he saw

three men with guns. *Id.* at 193. Another witness testified that he did not see the defendant in the building of the shooting but did see him afterwards. *Id.* at 193-94. Other witnesses cast doubt on whether the defendant was one of the shooters or was carrying a gun. *Id.* at 194-95. There was also no physical evidence tying the defendant to the crimes. In light of these facts, the court held that defense counsel's failure to present any closing argument amounted to ineffective assistance. This court stated that counsel had forgone an "opportunity *** to impress upon the jury the inconsistencies in the State's witnesses' identification testimony as well as the lack of *** physical evidence connecting the defendant to the offenses in this case." *Id.* at 200.

¶ 50    Here, there were no significant inconsistencies in the State's case, and the jury's decision did not come down to whether the jury believed different aspects of confusing or inconsistent evidence. Moreover, a conversation took place between the trial court and defendant in which the trial court asked whether defendant was surprised by defense counsel's decision to waive closing argument and whether he agreed with her decision. Defendant stated that he was not surprised and that he agreed to the waiver.

¶ 51    Defendant also contends that the waiver of closing argument amounted to deficient performance by defense counsel because defense counsel had promised in opening statements that the jury would "hear" from defendant at trial, but defendant did not testify. Defendant contends that closing argument was the only opportunity for defense counsel to explain why defendant did not testify. We disagree. First, we think it is entirely plausible that when defense counsel stated that the jury would "hear" from defendant, she was referring to five hours of interviews with defendant, conducted by police officers, which were played in open court for the jury. The jury heard, through those interviews, defendant's account of what happened in the days leading up the murders, the morning of the murders, and the days after the murders. Secondly, even if defense counsel had intended for defendant to testify, it is entirely plausible that "valid reasons existed for trial counsel's strategic decision to alter the defense theory as the trial proceeded." *People v. Schlager*, 247 Ill. App. 3d 921, 933 (1993). Defendant also made it clear during trial that he was aware of his right to testify and had chosen not to. After the State rested, the trial court informed defendant that the right to testify was his alone and not a decision his attorney could make for him. Defendant indicated he understood, and then the trial court asked, "Do you desire to testify?" Defendant responded, "No." Accordingly, we find that defense counsel's choice not to give closing argument was one of trial strategy.

¶ 52    Finally, even if we were to find that defense counsel's waiver of closing arguments, coupled with her alleged promise to the jury that it would hear from defendant, amounted to deficient performance, defendant has not proven the second prong of the *Strickland* test—that had defense counsel given a closing argument, the outcome of the trial would have been different. The evidence in this case was overwhelming. Defendant answered a Craigslist ad posted by the victims and then moved into their apartment a mere five days before their murders. The day before the murders, Lee's password and e-mail address linked to her Chase account were changed. The overdraft protection was also changed on her account, and $20,000 was transferred from her savings account into her checking account. A few hours later, a wire transfer order of $9800 was placed from Lee's bank account to defendant's bank account. The morning of their murders, defendant entered Saour's bedroom and stated that he had spilled poison in the bathroom. Saour left because he was afraid. Defendant then placed a call to police at about 4:15 a.m., claiming to be out running when he was attacked by three Hispanic men,

one of whom attacked him with a knife. He went to the hospital and received stitches for the knife wound to his thumb. It was later discovered that the victims had been stabbed to death that morning, receiving over 180 stab wounds.

¶ 53 The fire department responded to the apartment at approximately 4 p.m. on the day of the murders.

¶ 54 Defendant then proceeded to drive Lee's car, cash checks from her account, and use her credit card to purchase airfare and a hotel room in Las Vegas. Defendant made several charges to Lee's and Brown's credit cards while in Las Vegas. Defendant placed several calls to Discover asking for assistance in using Lee's credit card and claimed his name was "Cathy Lee." Defendant then stated Lee had trouble speaking English, so he was calling for her. The agent then offered to get an interpreter, to which defendant said he would call back. When he called back, he used a different voice. After wrongly answering security questions, the agent told him she could not help defendant. Defendant attempted three more calls, which were all unsuccessful.

¶ 55 Upon his arrest when he landed in Chicago, Lee's Discover card and Brown's bank card were both found in defendant's possession. He had Lee's mutual fund statement in his possession. He also had an odometer reading from Lee's car and a signed and notarized letter requesting purchase of Lee's car by defendant. A search of defendant's new apartment yielded several documents bearing Lee's name, checks from Lee's account made payable to defendant after her death, and Brown's attorney badge.

¶ 56 After defendant's arrest, defendant first claimed he had stolen Lee's and Brown's credit cards but did not know they had been murdered. He said he had been out running on the morning of the incident between 5:30 a.m. and 6 a.m. when he was attacked by three assailants. When confronted with his 911 call that was made at 4:10 a.m., defendant stated that it was not looking good for him. He also claimed that he played tennis with Lee a day after she died and that two days after her murder, she gave defendant some rent money back. After several hours of interviews, defendant then changed his story and claimed that on the morning of the incident, a man had entered the apartment and stabbed the victims in front of defendant. Defendant claimed he escaped and called 911 but made up the story of the three assailants instead of telling the truth.

¶ 57 The circumstantial evidence in this case is overwhelming. We cannot say that had defense counsel given a closing argument, the outcome of this case would have been different. Thus, because defendant cannot meet the second prong of the *Strickland* test, his claim for ineffective assistance of counsel must fail.

¶ 58                                                            CONCLUSION

¶ 59 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 60 Affirmed.

¶ 61 JUSTICE CUNNINGHAM, specially concurring:

¶ 62 I agree with the conclusion reached by the majority, specifically, that the circumstantial evidence in this case was overwhelming. Therefore, we cannot say that the failure to give a closing argument was the reason for the defendant's conviction. However, I write separately,

and briefly, to express my strong disapproval and disbelief regarding the defense attorney's purported trial strategy that resulted in her decision to forego a closing argument entirely. In my view, there are very few cases in which failing to give a summation is advantageous to a defendant. This case is not among that rare few. So, the failure to give a closing argument in this case, under these facts, does not pass the smell test. It is not hyperbole to say that to all appearances, defendant's counsel figuratively threw in the towel. Thus, counsel's assertions on appeal regarding the alleged strategic advantage of that decision is, in my view, contrived after the fact in an attempt to explain the inexplicable.

¶ 63    As noted, there was a mountain of circumstantial evidence in this case. Given the bountiful amount of evidence and the defense theory of the case—specifically, that someone other than the defendant committed the murders—a closing argument under these facts became even more important, not less. Further, the defense attorney promised the jury that it would hear from the defendant. That promise was not kept, and defendant's attorney claimed that the decision to forgo defendant's testimony was also strategic. While that decision may truly have been strategic and understandable, when that broken promise is coupled with the failure to deliver a *single word* in a closing statement, it could be construed as telegraphing to the jury that even the defendant's own attorney thought he was guilty. The decision to have so unexpectedly and inexplicably declined to give a closing argument, likely gave rise to negative speculation by the jury. It could not have been lost on them that the State used its closing argument to tie together the many pieces of circumstantial evidence that it argued pointed to the defendant's guilt. By refusing to say a *single word in opposition* to that lengthy and strong argument by the State, defense counsel's action suggested that there was *nothing to say* in opposition. The logical inference that the jury could then draw is that defense counsel agreed with the State. Against the backdrop of this record, defense counsel's "trial strategy" assertions after the fact make little sense, do not ring true, and did not serve the defendant's interest.

¶ 64    In fact, there were many areas in which defense counsel could have pointed out the weaknesses or discrepancies in the State's evidence. She could and should also have highlighted those facts that supported the defense theory of the case. Instead, what she did was tantamount to figuratively throwing up her hands in acquiescence to the State's evidence. This is hardly the action of an attorney who is vigorously defending her client.

¶ 65    The defendant was entitled to a defense that was free from the appearance that his own lawyer thought more of the State's evidence than of his innocence. So, while the judgment reached by my colleagues is not the factor with which I take issue, I find it imperative to condemn defense counsel's conduct in the strongest terms under the facts of this case. Every defendant is entitled to a vigorous defense that is not tainted by the appearance of irregularity that occurred in this case. See *People v. Leeper*, 317 Ill. App. 3d 475, 481 (2000) (while a defendant is not entitled to perfect representation, competent representation is required).

¶ 66    So, while defense counsel's conduct did not ultimately change the outcome of the case, it is important to make clear that such conduct cannot be condoned.